Donald ASKEW et al.,
Plaintiffs-Appellants,

v.

Kenneth BLOEMKER et al.,
Defendants-Appellees.

No. 76–1053.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 18, 1976.

Decided Dec. 30, 1976.*

---

* This appeal was originally decided by unreported order on December 30, 1976. See Circuit Rule 35. The panel has subsequently decided to issue the decision as an opinion.

Richard Shaikewitz, Alton, Ill., for plaintiffs-appellants.

Raymond D. Battocchi, Atty., Dept. of Justice, Washington, D.C., David P. Schippers, Chicago, Ill., Michael J. Costello, Springfield, Ill., for defendants-appellees.

Before CLARK, Associate Justice,** CASTLE, Senior Circuit Judge, and BAUER, Circuit Judge.

BAUER, Circuit Judge.

Plaintiffs appeal from a district court order granting defendants summary judgment on the three causes of action brought against them under the Civil Rights Act, 42 U.S.C. §§ 1983, 1985(3), and the Fourth Amendment, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Askews' claims arise out of alleged deprivations of civil rights suffered when the defendants, federal drug enforcement agents, "raided" plaintiffs' home while engaged in a search for a suspected criminal.

The alleged raid resulted from an investigation by the St. Louis Office for Drug Abuse Law Enforcement (DALE), an agency of the United States Department of Justice, into a narcotics network operating in the greater St. Louis metropolitan area. On the night of the raid, the defendants, all DALE agents, were attempting to arrest a number of suspected conspirators. Because the suspects were believed to reside at several locations in Southern Illinois proximate to St. Louis, DALE had requested the Illinois Bureau of Investigation (IBI), a state law enforcement agency, to provide agents to assist in a back-up capacity. The federal and state agents met early in the evening to plan the operation, which was directed by the DALE agents in charge of the case. The agents were divided into groups to search for particular suspects at various locations in Illinois. Their initial forays proving fruitless, the agents later regrouped at a parking lot to decide their next move. They determined to proceed to 313 West Washington Street, Collinsville, Illinois, the putative residence of Terry Coleman, one of the suspects. The first agents arrived there about 9:30 p. m. They were informed by the residents, a Mr. and Mrs. Niemeyer, that Coleman did not live there. Although they evidently did not know the man, the Niemeyers suggested that the suspect might live at 313 Garnett Street, the Askew residence, because they had observed several "hippie-type" youths at the house and thought that local police had made narcotics arrests there in the past. Agents who had talked with the Niemeyers passed the information on to others. The agents then proceeded as a group towards the Askew residence. Two of the DALE agents went to the front door. Other agents surrounded the house and secured the vicinity. Some remained in the street in front of the house. The depositions of the various participants conflict as to what then occurred.

** The Hon. Tom C. Clark, Associate Justice (Retired) of the United States Supreme Court, is sitting by designation.

The Askews characterize what happened as a "raid." When Donald Askew discovered that his house was being approached by armed men, he locked the front door and shouted to his wife Virginia to call the police, and to his son Michael to get out of the house. Donald believed that the "hippie-looking" agents were a gang out to get Michael. Virginia testified that she ran to the phone but was prevented from calling the police by a man pointing a gun at her through a window. Michael's movements inside the house prompted an agent peering through a window to shout, "They are running to the back. Hit the door." Agent Brewer, stationed at the back door, responded by breaking into the Askew home. Meanwhile, the agents at the front door, after initially trying to force their way in, according to the Askews' testimony, showed their identification and were admitted. Once inside the house, the agents entered rooms and searched closets. They refused to stay until local police could be summoned, and at least one of the agents is said to have improperly identified himself. The agents left after about 15 minutes, leaving a phone number for the Askews to call regarding reimbursement for damage done to the rear door. All the Askews claim that guns were pointed at them or in their direction at some point during the raid.

Defendants take issue with much of the Askews' testimony and characterize their own activities as a "visit." The agents contend that they had probable cause to arrest Coleman and, in light of what the Niemeyers had told them, a reasonable basis for inquiring whether he was at the Askew address. All they had done was approach the house for that purpose, and their subsequent actions were appropriate responses designed to provide for their own safety. The agents assert that they reasonably held a good faith belief that their conduct was lawful. They deny ever having attempted to force their way in by kicking down the front door. Rather, they say, they were voluntarily admitted after immediately showing Mr. Askew their official credentials. Agent Brewer's break-in through the back door was necessary, he says, because he believed that another agent was in trouble inside the house. He deposes that he never pointed his weapon at anyone and left almost immediately after discovering agents had been admitted through the front door. The agents who had surrounded the house also deny that they ever pointed any guns at the Askews or prevented Virginia from calling the police. While inside the house, the agents properly identified themselves, peeked into one or two closets only for self-protection, and took great pains to relieve the Askews' apprehensions. The agents point to Donald Askew's testimony that they conducted themselves courteously and never attempted a forced entry other than the one prompted by Michael's flight. They argue that the testimony of Virginia and Michael to the contrary is manifestly absurd and unreliable in light of Donald's conflicting statements.

The district judge, largely crediting the agents' version, granted summary judgment on the Askews' *Bivens* claim because he believed that no genuine issue of material fact existed on the question of whether the agents reasonably held the good faith belief that their conduct was lawful. *Tritsis v. Backer*, 501 F.2d 1021, 1022–23 (7th Cir. 1974).

The judge also granted the defendants' motion for summary judgment on the Askews' § 1983 and § 1985(3) claims because he determined that, as federal agents, the defendants were not subject to suit on the basis of plaintiffs' civil rights claims.

For the reasons noted below, we affirm the district court's grant of summary judgment on the claims alleged under 42 U.S.C. §§ 1983, 1985(3), but we reverse the grant of summary judgment on plaintiffs' *Bivens* claim and remand the case for trial.

I

## FEDERAL AGENTS ARE NOT SUBJECT TO SUIT UNDER § 1983.

Title 42 U.S.C. § 1983 provides a cause of action for constitutional deprivations arising out of actions taken under

color of state law. No claim lies under § 1983, however, for actions taken under color of federal law. *District of Columbia v. Carter,* 409 U.S. 418, 424, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *City of Milwaukee v. Saxbe,* 546 F.2d 693, 703 (7th Cir. 1976); *Smith v. United States Civil Service Commission,* 520 F.2d 731, 733 (7th Cir. 1975).

██ All the defendants in the instant case were assigned on a full-time basis to DALE, a federal agency. Prior to their assignment to DALE, seven of the defendants were employed by other federal agencies; three, by the St. Louis Police Department (SLPD). The Askews ground their § 1983 claim on the fact that the latter three agents remained SLPD employees during their assignment to DALE, and thus were "dual-status" agents acting concurrently under color of federal and state law. Plaintiffs say this renders the SLPD-affiliated agents subject to suit under § 1983. *Calhoun v. Doster,* 324 F.Supp. 736 (M.D. Ala.1971). The seven other DALE agents are also liable under § 1983, it is argued, because they were "acting in concert" with the SLPD officers and the IBI agents called in as backup by DALE. *Kletschka v. Driver,* 411 F.2d 436 (2d Cir. 1969). The undisputed facts established by the pleadings, affidavits and depositions before the district court, however, belie plaintiffs' allegation that any of the defendants were acting under color and authority of state law during the raid on the Askew home.

We recognize that, during their assignment to DALE, the three SLPD-affiliated agents continued to carry their SLPD badges, remained accountable to SLPD supervisors, and were paid by checks issued by the SLPD. However, they were also provided with official Justice Department credentials, were subject to the immediate control of DALE supervisors, were paid out of federal funds on a salary basis like that of other DALE agents and unlike that of other SLPD officers, and were covered under the Federal Employees Compensation Act for injuries suffered during their DALE assignments. These facts cast an indelibly federal hue upon the activities of these agents, even though they maintained official links with the SLPD. Furthermore, the totality of the circumstances surrounding the alleged raid out of which plaintiffs' § 1983 claim arises clearly shows that these agents were acting pursuant to federal authority and not under color of any state law.

██ The raid itself resulted from a federal investigation, whose purpose was to arrest persons suspected of federal law violations. There is no doubt that the raid was instigated exclusively by DALE, and the named defendants' activities were clearly directed by and subject to the immediate control of DALE supervisors. The only evidence at all supportive of plaintiffs' state-action allegation is that one of the SLPD-affiliated DALE agents presented his SLPD badge, and not his Justice Department credentials, in gaining admission at the front door of the Askew home. But the mere assertion that one is a state officer does not necessarily mean that one is acting under color of state law. *Byrne v. Kysar,* 347 F.2d 734, 736 (7th Cir. 1965), *cert. denied,* 383 U.S. 913, 86 S.Ct. 902, 15 L.Ed.2d 668 (1966). In the instant case, there can be no doubt that even the actions of this "dual-status" agent were necessarily taken pursuant solely to federal authority, for he could not have acted under color of state law at the Askew residence in Collinsville, Illinois, as it was outside his jurisdiction as a St. Louis police officer. *Chicago's Last Department Store v. Indiana Alcoholic Beverage Commission,* 161 F.Supp. 1, 4–5 (N.D. Ind.1958). Plaintiffs, thus, cannot base their § 1983 claim on the concerted action of the three SLPD-affiliated officers and their seven DALE codefendants.

██ Nor do we believe that plaintiffs can bootstrap a § 1983 claim against the defendants on the involvement of the handful of Illinois law enforcement officers present at the Askews. Because they were there solely in a back-up capacity, the involvement of the Illinois agents in the raid was de minimis. Indeed, only one of the IBI agents admitted even having entered the Askews' property as part of the group of

agents surrounding the home. The depositions of the other IBI agents reveal that they were standing in the street near the house. Furthermore, if plaintiffs are to rely on the concert-of-action theory enunciated in *Kletschka v. Driver, supra,* to support a § 1983 claim against the DALE defendants, the Askews must at least have alleged a conspiracy between the named defendants and these state officials as a basis for their § 1983 claim. E. g., *Jones v. Bales,* 58 F.R.D. 453, 458 (N.D.Ga.1972), *aff'd,* 480 F.2d 805 (5th Cir. 1973). No such allegation has been made. Moreover, we doubt that such an allegation would support a § 1983 claim against the federal agents named herein. At least here, where *both* the impetus for, *and* the execution of, the actions complained of derives from federal officials and not, as in *Kletschka,* at least partly from state officials, the mere presence of state agents in a support status does not turn a federal law enforcement endeavor into state action sufficient to support a § 1983 claim against the federal agents whose official actions necessarily stand on an independent, federal law bottom.

We hold that the ten DALE-agent defendants named herein were acting solely under color of federal law while engaged in the activities complained of by the Askews. Accordingly, the district court properly ruled that the defendants are not subject to suit under § 1983, and we affirm the court's grant of summary judgment against plaintiffs on their § 1983 claim.

## II

### PLAINTIFFS HAVE NOT MADE OUT A CLAIM UNDER § 1985(3).

■ Our holding that plaintiffs have failed to show that the defendants were acting under color of state law is not necessarily fatal to their § 1985(3) claim. Even absent state action, plaintiffs may make out a § 1985(3) claim if they show that the defendants conspired to deprive the plaintiffs of equal protection of the laws. This requires, according to *Griffin v. Brecken-*ridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."

Recognizing that they could show no racially discriminatory animus behind the defendants' actions, plaintiffs argue that an "otherwise class-based" animus suffices under *Griffin,* and that the requisite class-based animus is supplied here by the fact that the defendants raided the homes of citizens other than the Askews during the night in question. Allegedly, these citizens were deprived of equal protection of the laws because they were discriminated against as a "class."

■ Even assuming *arguendo* that a non-racial class-based animus meets the *Griffin* requirement, a question not yet decided for this Circuit, plaintiffs' purported "class" is not the kind of class "based on race, ethnic origin, sex, religion, [or] political loyalty" that could ever support a § 1985(3) claim. *Murphy v. Mt. Carmel,* 543 F.2d 1189, 1192 n. 1 (7th Cir. 1976). Plaintiffs' class members shared no common characteristics prior to the defendants' action. Indeed, their status as a "class" of victims depends entirely upon the defendants' actions, and it is not possible for defendants to have conspired to discriminate against a class that did not even exist until after they had acted. Thus, no "class-based discriminatory animus" could have motivated the defendants' actions, and the plaintiffs have not met the prerequisites to a § 1985(3) claim under *Griffin.*

We affirm the district court's grant of summary judgment on plaintiffs' § 1985(3) claim.

## III

### PLAINTIFFS ARE ENTITLED TO TRY THE ISSUE OF WHETHER DEFENDANTS REASONABLY BELIEVED IN GOOD FAITH THAT THEIR CONDUCT WAS LAWFUL.

In granting defendants summary judgment on the *Bivens* claim brought against

them, the district court relied on *Tritsis v. Backer,* 501 F.2d 1021 (7th Cir. 1974), wherein this Court held that federal law enforcement officials have a valid defense to a *Bivens* damages claim if they show *both* that they believed in good faith that their conduct was lawful, *and* that this belief was reasonable. In *Tritsis* we affirmed a grant of summary judgment on defendants' behalf because they presented affidavits stating facts affirmatively showing that they had acted reasonably and in good faith, and because the plaintiff's opposing affidavits failed to controvert those facts or provide any other "specific facts showing that there [was] a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ In the instant case, as in *Tritsis,* the defendants offered affidavits stating that they had acted in good faith and had reasonably believed their conduct was lawful. Their affidavits, however, contain only conclusory assertions of ultimate fact that are entitled to little weight on a motion for summary judgment. *Ashwell Co. v. Transamerica Ins. Co.,* 407 F.2d 762, 766 (7th Cir. 1969); cf. *Bracey v. Herringa,* 466 F.2d 702, 704–05 (7th Cir. 1972). They contain no *facts* affirmatively showing that there is no material issue of fact as to the reasonableness of their good faith belief. Moreover, unlike the sparse record in *Tritsis,* the record before us contains voluminous material cognizable on a motion for summary judgment, including numerous depositions and some transcripts of testimony from the criminal trial at which defendants were previously acquitted of violating the civil rights of the Askews and other citizens. *Langston v. Johnson,* 156 U.S.App.D.C. 5, 478 F.2d 915, 918 n.17 (1973). Confronted with evidentiary material of such sweeping scope, and viewing the evidence and all reasonable inferences therefrom in the light most favorable to plaintiffs, we believe that the material properly before the district court controverts the conclusory assertions of the defendants with "specific facts" showing that there exists a genuine issue of fact for trial. Fed.R.Civ.P. 56(e).

■ We note at the outset that the question of whether the defendants acted reasonably and in good faith is itself an ultimate question of fact whose resolution depends upon the circumstances of the alleged raid and the motivations of the defendants revealed by the evidence presented to the jury at trial. *Imbler v. Pachtman,* 424 U.S. 409, 417–19, 96 S.Ct. 984, 989 n.13, 47 L.Ed.2d 128 (1976). Cases in which motive and intent play a leading role are peculiarly inappropriate for disposition on a motion for summary judgment. *Foster v. Zeeko,* 540 F.2d 1310, 1319 (7th Cir. 1976); *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir. 1974). Plaintiffs are entitled to take to the jury the state-of-mind defense on which the defendants herein rely as long as plaintiffs have adduced specific facts from which a reasonable man, viewing all the evidence in the light most favorable to plaintiffs and resolving all testimonial conflicts in the same manner, could infer that the defendants were acting either in bad faith or unreasonably.

■ Numerous facts set out in the material properly before the district court cast considerable doubt on the defendants' claims that they were acting reasonably and in good faith. Assuming *arguendo* that the agents had no time to obtain search and arrest warrants on the night of the raid, and that they had probable cause to arrest the suspects targeted, it remains highly questionable whether they had a reasonable basis for believing that any of the suspects were present at the Askew home. When they failed to locate any of the other targeted suspects early in the evening, and later discovered that Coleman did not live at 313 West Washington Street in Collinsville, Illinois, the agents should have been on notice that the information on which they were proceeding was erroneous. Nor does the information supplied by the Niemeyers conclusively demonstrate that the agents had a reasonable basis for their actions. The Niemeyers did not know Coleman, and the only basis for their suggestion that the suspect might be at the Askew residence was their belief that "hippie-type" youths frequented the house and that

local police had made narcotics arrests there. Even if this information gave the agents a reasonable basis for making an inquiry at the Askews, we believe that a jury could reasonably infer that the defendants' actions were inconsistent with this purported purpose of their "visit." Taking the Askews' testimony as true, as we of course must in considering defendants' motion for summary judgment, we fail to see why agents bent on a reasonable inquiry must surround a house with armed men, proceed to break in, and then search the domicile for their own safety when they had no specific information that their suspect was in fact present. That even one of the agents improperly identified himself after being admitted to the Askew home in itself creates a sufficient basis for a reasonable jury to infer that the defendants themselves realized their conduct was unreasonable and improper. Moreover, the manner in which the agents treated the Askews' neighbors and other citizens whose homes were broken into on the night of the alleged raid—evidence surely relevant to the defendants' state of mind during their operation—tends to impugn the reasonableness of their good faith belief that their conduct was lawful and to undermine their contention that they were simply checking out a tip at the Askew house.

We realize that there is substantial conflict regarding what occurred at the Askews. Precisely because there is such conflict, this case is thoroughly inappropriate for summary judgment. Had the facts related by the Askews and their neighbors been stipulated as true by the parties, we would have little difficulty in holding as a matter of law that the conduct of the agents was so outrageous as to conclusively negate not only the reasonableness of their belief that they were acting lawfully, but their good faith as well. We hold that a material issue of fact exists for trial, name-ly, whether the defendants *reasonably* believed in good faith that their actions were lawful.

■ Having held that defendants have failed to meet their burden of showing that no material issue of fact remains for trial, we must confront their argument that plaintiffs were not deprived of any constitutionally guaranteed right because no search or seizure wanting probable cause occurred at the Askews. Accepting as true, as we must, the Askews' testimony, there can be no doubt that agents who surround a home, peer into windows, hold the occupants at bay with drawn guns, break into the house and proceed to search rooms and closets, are engaged in a search and seizure within the meaning of the Fourth Amendment. Nor can there be any doubt that the agents had no probable cause to believe that their targeted suspect was within the Askew home on the night in question. They initially went to the wrong house, 20 miles from where they should have been,[1] and proceeded to the Askews—at night and without warrants—purely on the basis of hearsay information obtained from the Niemeyers, who did not even know the targeted suspect. We believe that, should the testimony adduced at the defendants' criminal trial and reflected in the depositions submitted in this case be brought out at trial, the plaintiffs would make out a prima facie case that they were deprived of their constitutional rights under the Fourth Amendment.

We reverse the district court's grant of summary judgment on plaintiffs' *Bivens* claim and remand the case for trial.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

1. The agents were informed by a St. Louis police officer that Coleman resided at 313 West Washington Street in Collinsville, Illinois, which was in fact the Niemeyer residence. Subsequent to the events at issue, it was learned that Coleman's correct address was 313 West Washington Street in Belleville, Illinois. Apparently a mistake had been made in transcribing Coleman's address, presumably by either the informant, his secretary, or the agent who took down the information passed over the telephone.