**John MEINERS, Plaintiff-Appellant, Cross-Appellee,**

v.

**Dennis MORIARITY et al., Defendants-Appellees, Cross-Appellants.**

**Nos. 76–1730, 76–1731.**

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1977.

Decided Oct. 6, 1977.

Raymond D. Battocchi, Civ. Div., Dept. of Justice, Washington, D. C., David P. Schippers, Chicago, Ill., Michael J. Costello, Springfield, Ill., for Moriarity.

Lola P. Maddox, Richard P. Shaikewitz, Alton, Ill., for Meiners.

Before FAIRCHILD, Chief Judge, and SWYGERT and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

Plaintiff-appellant John Meiners appeals from a jury verdict against him on his suit for money damages against the defendants for alleged deprivations of his constitutional rights. Plaintiff also appeals from a verdict in favor of the defendants awarding monetary damages on their counterclaims for defamation. Defendants cross-appeal from the district court's ruling that they were "public officials" for purposes of their defamation claims and therefore were not entitled to collect punitive damages.

In the fall of 1972 agents from the Office for Drug Abuse Law Enforcement of the United States Department of Justice ("DALE") were investigating a narcotics

smuggling and distribution ring. Pursuant to the investigation undercover agents arranged to purchase cocaine from Edward Staffire and Jeffrey Bulmer at a farmhouse in which they lived near Edwardsville, Illinois. While this transaction was occurring in one part of the house, one of the agents, defendant Dennis W. Harker, sought to enter the house by the back door and was admitted by an unidentified man who did not take part in the sale of the cocaine.

Following this transaction the investigation continued and on the evening of April 19, 1973 Staffire was arrested. Deciding to cooperate with the agents, Staffire gave them the key to a car in which he said nine ounces of cocaine were hidden. He also gave them keys to the farmhouse and permission to search it although he stated that they would probably not find any narcotics. A substantial amount of cocaine was seized from the car, and in the early morning of April 20, it was decided that a number of DALE agents would go to the farmhouse.

Testimony concerning events at the farmhouse differed between plaintiff and defendants. Defendants' version was that two undercover agents approached the house and knocked on the door. They identified themselves as police officers and were admitted by plaintiff Meiners. Once they were inside, other agents converged on and entered the house. Defendant Harker's first impression upon seeing Meiners that night was that he was the man present at the farmhouse in the fall of 1972; he later stated that he was not sure about the identification. Harker then engaged Meiners in conversation and, when he began to make "potentially incriminating statements," read him his *Miranda* rights. Thereafter, Meiners told the agents that Staffire and Bulmer lived in the farmhouse, that he had once seen them bagging a white powdery substance, that he knew Staffire had been arrested on a drug charge in Texas prior to his present arrest, and that Meiners paid the rent and telephone bills. After consultation among themselves and further questioning of Meiners, the agents arrested Meiners. They believed that there was enough evidence to charge him with aiding and abetting and misprision of a felony.

Meiners then gave his permission for the agents to search the entire house, but no other persons nor any narcotics were discovered. When the agents left with Meiners, they secured and locked the house. At no time during the search was DALE agent Dennis Moriarity at the farmhouse. He became lost en route and, although in radio contact with the agents on the scene, never came closer than an Edwardsville gas station.

Meiners was taken to the DALE office in St. Louis, Missouri, and placed in the federal holdover section of the city jail. Later that morning Frederick Dana, the acting attorney in charge of the DALE office in St. Louis, spoke by telephone with agents who had participated in the search and arrest. After hearing the agents' story of the events of the night before, Dana decided not to charge Meiners at that time. The agents understood that Dana would have Meiners released. Three days later, on April 23, agent Harker learned that Meiners was still in jail. When asked, Dana stated that he had forgotten about him and sent Harker to release Meiners.

According to Meiners, when he returned to the farmhouse he found that it had been burglarized and vandalized while he was in jail. He filed a claim on his homeowner's insurance policy, telling the insurance company he had no idea who the burglars were. Around the end of May 1973, the insurance company reimbursed Meiners for all property he had listed as stolen.

Plaintiff's version of the April 20 incident was different. He stated that after he had opened the door a few inches in response to a knock, some of the defendants pushed their way in without identifying themselves. He was then forced up against a wall and was asked where the "stuff" was while a gun was pressed to his head. Plaintiff stated that he was handcuffed and questioned while items of his personal property were moved around by agents—items which later proved missing when he returned home from jail. He also complained

that the agents drank beer from his refrigerator, damaged his house, fired shots in the yard, and otherwise failed to act in a professional manner, all of which caused him to be frightened. Portions of these allegations were corroborated by David Kurz, a special agent of the Internal Revenue Service.[1] Plaintiff also contended that it was the responsibility of some or all of the defendants, as arresting agents, to see to his release from jail once the decision not to charge him had been made.

Subsequently certain DALE agents became the subjects of considerable publicity regarding their allegedly unlawful conduct during two "drug raids" in Collinsville, Illinois, on April 23, 1973.[2] Meiners testified before a grand jury investigating possible charges against DALE agents. By early July no indictments had been returned, although both state and federal grand juries had investigated the DALE agents' activities. On July 11, 1973 Meiners filed a complaint against the United States, agents Moriarity, Bloemker, Harker, Dwyer, Green, Olive, and Stolte, and other unknown agents, seeking $2,800,000 in damages.[3] The complaint alleged that the events testified to by Meiners occurred and that his constitutional rights had been violated. At a press conference that day, Meiners' attorney announced that the lawsuit had been filed because no federal action had been taken against the agents and because they were still on the job. Copies of the complaint were distributed to the press, and both Meiners and his attorney expounded upon the allegations of the complaint.

During the interview Meiners said that a significant amount of his personal property had been taken by federal agents. He also stated that the agents "wrecked" his home and had questioned him while holding a gun to his head. Meiners said that defendant Moriarity was present at the farmhouse, claiming he had discovered his identity by reading the name on his DALE badge.[4]

Subsequent to the filing of the lawsuit and the public statements by Meiners and his attorney, defendants Moriarity, Dwyer, Harker, Hillebrand, and Bloemker were suspended from DALE for thirty days without pay. The suspensions lasted until April 1974 when the agents were reinstated with backpay.[5]

Later that month Meiners again testified before a special grand jury convened to investigate charges against various DALE agents and once again accused the defendants of stealing his property. At the civil trial he admitted that he knew within a few days after returning home from jail that some of these items had not been taken during the raid.

On August 24, 1973 the special grand jury returned a series of indictments covering events which included those concerning Meiners. Plaintiff spoke with reporters at that time and indicated his displeasure that the agents were not charged with armed robbery. He stated that he had never received any of the items allegedly stolen during the raid.

1. Meiners testified that the one item he actually saw taken from the farmhouse was a small box of papers. Although IRS agent Kurz, who was not joined as a defendant, denied that he removed documents and financial information from the farmhouse or that he worked on a tax matter the next day using information obtained during the search, he was impeached by an entry in his personal diary, written shortly after the incident, which said he had "worked in the office all day following through with the information from the raid last night." On cross-examination, he stated the diary was inaccurate.

2. For a more detailed statement of the facts involved in one of those raids, see Askew v. Bloemker, 548 F.2d 673 (7th Cir. 1976).

3. On August 23, 1974 plaintiff filed an amended complaint adding defendant Hillebrand and dropping all reference to other "unknown agents." The United States was dismissed as a party defendant by the district court on October 3, 1974.

4. His complaint, however, alleged that the agents never properly or clearly identified themselves, and Meiners later admitted under oath that his televised statement was false. It was established at trial that the badges of DALE agents have no names on them.

5. The agents were reinstated following acquittal by a jury of all criminal charges brought against them.

Some of the charges against the agents were later dropped and they were acquitted in April 1974 following a jury trial.

The civil trial on plaintiff's complaint had been stayed pending the outcome of the criminal case. Eight of the defendants counterclaimed against the plaintiff seeking compensatory and punitive damages for defamation. The district court consolidated a separate complaint against former DALE agent Duffy. All claims and counterclaims were tried to a jury in April 1976. At the close of plaintiff's case, the district court directed a verdict in favor of defendants Moriarity, Hillebrand, Stolte, Olive, and Duffy as to plaintiff's claim. At the conclusion of the trial the court ruled that defendants were to be considered "public officials" for the purpose of the counterclaims. The court ruled that the defendants as public officials were precluded from recovering any punitive damages and were required by *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to prove by clear and convincing evidence that Meiners' allegedly defamatory statements were made with "actual malice" in order to recover compensatory damages. The jury returned verdicts against Meiners on his claim against the four defendants who had not received directed verdicts and awarded each of the eight defendants who counterclaimed compensatory damages of $15,000. Plaintiff appeals from the judgments entered against him, and five of the eight defendants who counterclaimed appeal the trial court's rulings as to their status as public officials and their consequent preclusion from seeking punitive damages.

### I

We first address plaintiff's various arguments for reversal of the verdicts against him on his claims.

■ Plaintiff argues that he has a right to proceed against these federal agents under 42 U.S.C. §§ 1983 and 1985(3). The district court found these sections inapplica-

ble and did not allow plaintiff to proceed under them. This court's decision in *Askew v. Bloemker,* 548 F.2d 673 (7th Cir. 1976), effectively disposes of plaintiff's argument and shows that the district court acted correctly. Defendants at the time of the raid were federal agents operating under color of federal and not state law, and thus did not fall within section 1983. Nor does plaintiff allege that he belongs to the kind of class based on race, religion, ethnic origin, sex, or political loyalty that could support a claim under section 1985(3).[6]

Plaintiff was, however, allowed to proceed on his cause of action based directly on the Fourth and Fifth Amendments. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiff appeals the adverse jury verdict on this claim, contending that it is against the weight of the evidence.

■ A reasonable, good faith belief that probable cause existed when an arrest or search was made, however, is an adequate defense to a *Bivens* claim. *Tritsis v. Backer,* 501 F.2d 1021 (7th Cir. 1974); *Brubaker v. King,* 505 F.2d 534 (7th Cir. 1974). The question whether the defendants acted reasonably and in good faith is ultimately factual and, as such, one to be finally determined by the jury. *See Askew v. Bloemker,* 548 F.2d at 679.

■ Plaintiff has alleged that defendants' acts were unlawful in that the defendants did not possess a warrant for the arrest or search. From the record it appears there was sufficient evidence for the jury to find that the defendants were justified in Meiners' arrest on the basis of their belief that probable cause existed at the time of the arrest. One of the agents, Harker, thought that Meiners was the person who had let him in the back door the previous November. Meiners himself, after questioning, admitted he had seen his roommate bagging white powder, knew that Staffire had been arrested on a drug charge in Texas a week before, and stated that he paid

---

6. For a detailed discussion of this point, see this court's decision in *Askew,* 548 F.2d 673 (7th Cir. 1976), which involved most of these same defendants.

the rent and telephone bill. This was sufficient to support a decision to arrest Meiners for aiding and abetting and for misprision of a felony.

The jury might also have concluded that the warrantless search was valid because Staffire consented to the search of the house. This validated the search of Staffire's quarters and common areas, because the facts are clear that Staffire had at least mutual use of the property and joint access for most purposes. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Moreover, Meiners himself consented to the search, apparently after it had already begun in the common areas, thus validating the search of his private quarters. There is no evidence as to whether Meiners' own private quarters were searched before he gave consent.

■ Plaintiff claims further that each of the defendants who knew of his arrest and of the decision not to prosecute owed him a duty to see to his release. Plaintiff cites *Whirl v. Kern,* 407 F.2d 781 (5th Cir. 1965), in support of his proposition. That case, however, involved a sheriff who had a statutory duty under local law to investigate the authority under which prisoners were held in his county jail. Here, a statutory duty arises under Fed.R.Crim.P. 5(a),[7] requiring the arresting agent to see that the person arrested is taken before a magistrate.

This claim, based on both the statutory duty and apparently a *Bivens* type cause of action grounded in the Fifth Amendment, was submitted to the jury. The jury, instructed that plaintiff had the burden to prove all essential elements of his claim, again found against Meiners. We do not find that a statutory or other duty of this kind is absolutely non-delegable and cannot hold, as a matter of law, that the defendants continued to be liable once they in good faith believed that Dana, the United States Attorney, had assumed the responsibility for charging the plaintiff. Thus, this question of responsibility was a factual one properly left to the jury to decide along with the other factual questions involved in this claim. Further, we cannot say on what basis the jury made its decision.

■ Plaintiff also cites as error the trial court's instruction to the jury on the elements of misprision of a felony. He contends that this instruction was prejudicial to him because he was never charged with that crime. Inasmuch as the jury had to determine if the agents had a *reasonable* good faith belief that probable cause existed for plaintiff's arrest (since that formed the basis of their defense to the Fourth Amendment *Bivens* claim), it was correct for the judge to instruct the jury as to the elements of misprision so that their decision could be an informed one. While it may not have been good judicial procedure to use Meiners' name while giving the instruction, he was clearly the only person in the case to whom the instruction applied, and it appears that little if any prejudice actually resulted from the naming.

■ We do not find that any of plaintiff's other contentions merit reversal. It was not error for the trial court to direct a verdict in favor of some defendants as plaintiff had the burden of proof and failed to sufficiently identify those defendants. It was within the trial court's discretion to reject as a collateral matter plaintiff's offer to prove a cover-up conspiracy.

■ Plaintiff's contention that defendants' reference in closing argument that

---

7. Fed.R.Crim.P. 5(a) reads:

In General. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041. If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause. When a person, arrested with or without a warrant or given a summons, appears initially before the magistrate, the magistrate shall proceed in accordance with the applicable subdivisions of this rule.

they would have to pay a judgment out of their own pockets does not merit reversal. When disclosure of insurance comes into question in cases involving tortious conduct, it is generally excluded for the exact opposite rationale that plaintiff espouses: the fear that a jury would award an excessive amount if it believes that the defendant is insured. Similarly Meiners' contention that it was improper for the Department of Justice to represent the defendants is without merit.[8] The defendants hired private counsel to try their counterclaims; the Department of Justice merely defended them against Meiners' claims.

## II

■ We turn next to plaintiff's appeal from the jury verdict against him on the defendants' defamation counterclaim. He contends that the jury instruction as to malice was improper. We find that the erroneous and confusing instruction warrants reversal of the jury's verdict on the counterclaims.

The trial judge instructed the jury as follows regarding malice:

> Under the law a person's good reputation is held in high regard, and when it is falsely attacked the law gives him the opportunity to bring an action to recover damages. When the party bringing an action is a public official, and the alleged libel or slander relates to his conduct in or fitness for office, then the party bringing the action must bear an additional requirement and must establish by clear and convincing evidence that the alleged libel or slander was published and said with actual malice.

> \* \* \* \* \* \*

> An individual acts maliciously when he shows a positive desire and intention to annoy or injure another person. Malice

in fact is a wrongful act done intentionally without just cause or excuse.

> You may find the plaintiff was actuated by malice if, in making the statements, he acted not in good faith but in bad faith toward a defendant officer, and with an intent to injure that officer and his reputation, or acted in willful, wanton and reckless disregard of the rights and interests of that officer.

> \* \* \* \* \* \*

> When I use the expression "willful and wanton conduct," I mean a course of conduct which shows an actual and deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard to the rights of others.

While it is true that the judge used the formula for actual malice required by the Court in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964),[9] it is also true that he included malice instructions not meeting the strict *New York Times* standard. Language defining malice in terms of a "positive desire and intention to annoy or injure another person," or as "a wrongful act done intentionally without just cause or excuse," falls far short of the constitutional standard, as does saying that the jury "may find the plaintiff was actuated by malice if, in making the statements, he acted not in good faith but in bad faith. . . ." The language amounts to basing a finding of malice on the "ill will" of the alleged defamer, and the Supreme Court has expressly stated that such a standard of malice is "constitutionally invalid . . . in the context of criticism of the official conduct of public officials." *Garrison v. Louisiana*, 379 U.S. 64, 77–79, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964); *see also Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Once the determination was made that de-

---

8. *See* 28 U.S.C. § 517.

9. "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726.

fendants were public officials,[10] a determination properly in the hands of the trial judge, *Rosenblatt v. Baer, supra* at 88, 86 S.Ct. 669, it was improper for the court to instruct the jury using any standard less than that laid out in *New York Times*. By adding the clearly improper "ill will" type of malice instruction, the court so confused the issue that the jury may well have found malice present on the basis of a finding of "ill will" rather than of knowledge of the falsity or reckless disregard as to whether the statements were true or not. This is especially likely in this case, where defendants had introduced a great deal of evidence concerning plaintiff's "ill will" toward them.[11] Thus a remand is required because of these constitutionally improper instructions.

 Because a remand is required, we do not find it necessary to reach all of plaintiff's other contentions. We do consider those errors, however, which may be likely to recur upon remand. Counsel for the plaintiff attempted to question a defendant as to whether events other than the Meiners incident resulted in publicity adverse to defendants. The court sustained an objection to the question at this point, though it did on numerous occasions allow evidence as to the prior bad reputation of the defendants, relevant to mitigation of damages in a defamation case. Rule 405(a) of the Federal Rules of Evidence allows inquiry into relevant specific instances of conduct in all cases where character evidence is admissible. Here, where reputation is relevant at least as to damages, Rule 405(a) should apply.

 The court also refused to instruct the jury on the elements of various crimes, including robbery and theft. In the cross-action for defamation, defendants had to show that the defamatory statements were made with knowledge of their falsity or with reckless disregard as to their veracity.

Moreover, plaintiff had available to him the defense of truth regarding the allegedly defamatory statements. Instructions on the elements of the crimes that plaintiff allegedly accused defendants of committing would be necessary in order for the jury to make an informed decision with respect to whether plaintiff had a reasonable basis for regarding his statements as true. Not to give the requested instructions is certainly inconsistent with allowing defendants' misprision instructions when the rationale underlying the need for giving each is the same.[12]

 It was error for the district court to instruct that Meiners "has the burden of proving substantial truth by the preponderance of the evidence, since he claims truth as a defense." Of course the alleged defamer may defensively offer proof that the statement is true, but such an offer does not cause the burden to shift to him. *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). *See Goldwater v. Ginzburg*, 414 F.2d 324, 338 (2d Cir. 1969); *Sellers v. Time, Inc.*, 299 F.Supp. 582, 584 n. 3 (E.D.Pa.1969).

We also note here that the court did properly instruct the jury on the agents' burden of proving that Meiners' statements were false in some material particular. This was an essential element of their case. Thus in addition to the opportunity to counter the agents' proof of falsity, the defense of truth merely allows Meiners an affirmative way to defend against the agents' defamation claim.

### III

 Defendants have cross-appealed the trial court's finding that they are public officials and, as such, are precluded from recovering punitive damages on their defa-

---

**10.** *See* discussion *infra* at 351–352.

**11.** This evidence included numerous statements by plaintiff and his counsel that a principal reason for plaintiff's bringing of this suit

was that he wished to see the defendants dismissed from their federal jobs. *See, e. g.,* transcript at 663–67.

**12.** *See* discussion *infra* at 349.

mation claim. The trial court ruled that, concerning their defamation counterclaims, defendants were "public officials" and thus were required to prove actual malice as defined in *New York Times*. Defendants admit in their reply brief that the Illinois courts have found street level police offi-ᴄers to be "public officials." *Coursey v. Greater Niles Township Publishing Corp.*, 40 Ill.2d 257, 239 N.E.2d 837 (1968). Although the definition of a "public official" here is a matter of federal and not of state law, *Rosenblatt v. Baer*, 383 U.S. 75, 84–85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), this court has held a deputy chief of detectives and lieutenant of the Chicago police department to be as "public officials." *Pape v. Time, Inc.*, 354 F.2d 558 (7th Cir. 1965), *cert. denied*, 384 U.S. 909, 86 S.Ct. 1339, 16 L.Ed.2d 361 (1966). In *Rosenblatt*, 383 U.S. at 86, 86 S.Ct. at 676, while discussing the concept of public officials, the Supreme Court stated:

> The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply. (footnotes omitted.)

The public is certainly interested in an important and special way in the qualifications and performance of federal agents, such as the defendants here, whose decisions to search and to arrest directly and personally affect individual freedoms. We need not fear, as the defendants contend, that holding them to be public officials will make the terms "public official" and "government employee" synonymous. Each case will have to be decided on its own facts, and here the trial court did not err in holding defendants to be public officials.

▆ Defendants contend that, even as public officials, they are entitled to recover punitive damages if they prove actual malice. The district court ruled that as public officials they were precluded from recovering punitive damages. There is, however, a procedural problem to overcome before we can consider the merits of this issue.

Defendants raised this issue for the first time in their reply brief before this court. Indeed, at trial they informed the judge that, if he found them to be public officials,[13] they would be precluded from recovering punitive damages under the Supreme Court's ruling in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). As defendants note, appellate courts generally will not consider a ground for reversal not urged upon a trial court, *Desert Palace, Inc. v. Salisbury*, 401 F.2d 320, 324 (7th Cir. 1968); this rule also applies to new legal theories first raised on appeal, *United States v. Home Indemnity Co.*, 489 F.2d 1004, 1007–08 (7th Cir. 1973). Defendants argue that we may overcome this problem and decide the issue, if we find this to be an exceptional case where justice demands that the defendants not be estopped by their prior position before the trial court. However, we do not find this to be such a case.

Accordingly, the judgment of the district court is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion. Costs of this appeal will be evenly divided.

---

**13.** At trial and in their main brief, defendants continually confused the concepts of "public figures" and "public officials." Thus they actually told the trial court that, if public *figures*, they would be precluded from recovering puni-tive damages. Their confusion of the concepts did not spread to the trial judge, who realized that the correct question was whether or not they were public *officials* and obviously translated their arguments accordingly.