The SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS HEALTH, WELFARE AND PENSION FUNDS, Plaintiff,

v.

CALLAGHAN PAVING, INC., an Illinois corporation and Daniel Callaghan, individually, Defendants.

No. 83 C 0828.

United States District Court, N.D. Illinois, E.D.

Jan. 17, 1984.

John J. Toomey, Hugh B. Arnold, Arnold & Kadjan, Chicago, Ill., for plaintiff.

Don A. Banta, J. Kevin Hennessy, Naphin, Banta & Cox, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Plaintiffs, the Suburban Teamsters of Northern Illinois Health, Welfare and Pension Funds (the "Funds") bring this action against defendants Callaghan Paving, Inc. ("Callaghan Paving") and Daniel Callaghan to collect fringe benefit contributions allegedly owed the Funds by Callaghan Paving. The Funds also seek an audit of Callaghan Paving's records and costs and liquidated damages pursuant to an alleged collective bargaining agreement and to section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(g)(2). Count I seeks recovery from Callaghan Paving and Count II is pendent and seeks recovery from the company's President and principal owner, Daniel Callaghan, as the "alter ego" of Callaghan Paving. Jurisdiction over Count I is asserted pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and section 502 of ERISA.

Presently before the Court is the defendants' motion for summary judgment or, in the alternative, for partial summary judgment limiting the period of liability to two days. For the reasons stated below, partial summary judgment is granted in favor of the defendants and against the Funds.

## Facts

Callaghan Paving is an Illinois roadway paving corporation, which at the relevant time performed work mainly in Cook County, Illinois. None of its employees—driver or other—has belonged to Teamsters Local 673, a union based in DuPage County, Illinois.

On October 22, 1975 Daniel Callaghan was visited at a job site in Oak Park, Illinois by Robert Venard ("Venard"), Secretary-Treasurer for Local 673. It is undisputed that two hours later Daniel Callaghan signed a preprinted agreement presented to him by Venard. The form which Daniel Callaghan signed provided, *inter alia,* for monthly payments to the Funds and union dues for Callaghan Paving employees. The form also referenced various trust agreements which were not attached and unquestionably never were signed by Daniel Callaghan nor submitted for signature to him by Venard or officials of the Funds. The reason for and validity of the signing is contested. The defendants assert that Venard threatened to close down the job unless an agreement was signed and, therefore, the agreement is invalid as it was coerced. The Funds argue that an enforceable collective bargaining agreement was made.

After signing, Daniel Callaghan gave Venard one or two checks, for initiation fees and union dues for the one driver working that day. Two days later Daniel Callaghan stopped payment on the checks. Venard then called to inquire about the dishonored checks and allegedly was told that the "company did little work in DuPage County and that if [the] drivers were to join any Teamsters Local they would join Local 731." Local 731 serves Cook County drivers.

By affidavit, Daniel Callaghan avers that whenever he later met Venard, Venard would indicate his continued desire to sign up Callaghan Paving employees as members of Local 673. To the contrary, Venard has no recollection of meeting or speaking with Daniel Callaghan after calling about the dishonored checks.

Callaghan Paving allegedly did not rely on the purported collective bargaining agreement: it never paid the wage rate set forth therein. Other than the initial payment on October 22, 1975, it did not pay any union dues to Local 673 on behalf of its employees despite an express dues check-off provision in the purported agreement. It is undisputed that Venard never transmitted to Local 673 or the Funds any subsequent payments on behalf of Callaghan Paving or any relevant reports. Also no driver employed by Callaghan Paving joined Local 673 and no shop steward was appointed by Local 673. No complaints were received by Callaghan Paving from either its employees, Local 673 or the Funds on matters germane to this case. No grievance proceedings were held in accordance with the disputed collective bargaining agreement.

Beginning in August 1982, driver-employees of Callaghan Paving joined Local 731, the Cook County local. On January 3, 1983, the Funds requested an audit of Callaghan Paving's record as provided by the trust documents referred to in the agreement. On January 6, 1983, Callaghan Paving replied that it was not then and never had been contractually obligated to Local 673, and that its employees were not members of Local 673. On February 8, 1983, the Funds initiated this action.

The pending motions contend that no enforceable collective bargaining agreement was formed due to duress. In the alternative, they argue that if a contract was formed, it is a voidable "prehire" agreement which was repudiated two days after execution. Thus, the defendants argue that their liability, if any, is limited to contributions to the Funds for two days.

## Discussion

■ Generally, an employer who deals with a union which has not attained the support of a majority of his workers commits an unfair labor practice. *See International Ladies Garment Workers Union v. NLRB,* 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). An exception is

made for employers in the construction industry who are permitted by the National Labor Relations Act ("NLRA") to make "prehire" agreements with a union regardless of its majority status representation. 29 U.S.C. § 158(f). The rationale underlying the construction industry exception was explained by the Ninth Circuit:

> As jobs begin and end, construction workers frequently change employers. Due to this, Congress has seen fit to allow so-called "pre-hire" agreements in that industry. These agreements may be signed before the union represents a majority of the employer's employees, and may continue in duration through more than one of the employer's jobs, even if the employer goes through a high employee turnover. These agreements allow the employees some of the wage and benefit advantages of union representation, as well as relative wage stability. The employer is assured a qualified pool of workers to choose from when it needs them, protection against labor unrest during the period of the contract, and predictable labor costs, an invaluable tool in the bidding process.

*Todd v. Jim McNeff, Inc.*, 667 F.2d 800, 802 (9th Cir.1982), *aff'd* —— U.S. ——, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983).

■ A prehire agreement, however, is not synonymous with a collective bargaining agreement: the former is only the first step toward achieving the latter relationship which cannot mature unless the union actually achieves majority status. *NLRB v. Local Union No. 103 ("Hidgon Construction Co.")*, 434 U.S. 335, 345, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978). Until a majority of employees indicate a willingness to be represented by a union, the prehire agreement is voidable. *Id.* 434 U.S. at 341, 98 S.Ct. at 655. In *Hidgon*, the Court held that union picketing for the

purpose of requiring an employer to adhere to a previously signed prehire contract was an unfair labor practice under section 8(b)(7)(C) of the NLRA.

In *Jim McNeff, Inc. v. Todd*, —— U.S. ——, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), the Supreme Court considered whether prehire agreements also are voidable as applied to section 301 actions by pension fund trustees to enforce the fringe benefits provisions of prehire agreements. McNeff, a subcontractor, had signed a prehire agreement pursuant to a master agreement between the prime contractor and the union. Subsequently, McNeff's employees signed union cards. McNeff submitted monthly report forms to the union trust funds, but falsely stated that no covered union members were employed. Therefore, he made no contributions on their behalf to the funds.

The *McNeff* Court affirmed the Ninth Circuit and held that "the voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract." —— U.S. at —— – ——, 103 S.Ct. at 1758–59. However, in that instance, McNeff did not manifest sufficient intent to repudiate. He had accepted the union's benefits and misled the union of his intent to honor contractual obligations.

The Court specifically refrained from addressing the question of what would constitute repudiation under proper circumstances.[1]

> It is not necessary to decide in this case what specific acts would affect the repudiation of a prehire agreement—sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipitating a representation election pursuant to the final pro-

---

1. In support of their contention that the prehire agreement is enforceable, the Funds cite three Northern District of Illinois cases, *Martin v. Benesh & Bruns, Inc.*, 532 F.Supp. 408 (N.D.Ill. 1982); *Hasty v. Atlas Construction Co.*, 81 C 2689 (N.D.Ill. Dec. 31, 1982); *Caporale v. Mid-City Paving Contractors, Inc.*, 78 C 3778 (N.D.Ill.

April 22, 1981). These cases were decided prior to the Supreme Court's decision in *Jim McNeff, Inc. v. Todd, supra.* Moreover, the issue here is not *whether* prehire agreements are enforceable, but rather *what* constitutes valid repudiation.

viso in § 8f that shows the union does not enjoy majority support.

— U.S. at —— n. 4, 103 S.Ct. at 1759 n. 4.

Absent an express direction as to what actions constitute repudiation or sufficiently communicate to a union or pension fund an intent to repudiate, courts must consider the facts and circumstances of each case. Viewing an employer's acts on a continuum, the magnitude of noncompliance "can be so bald as to put the union on notice of the employer's intent to repudiate. *Todd v. Jim McNeff, Inc.*, 677 F.2d at 804.

*Eastern District Council v. Blake Construction Co.*, 457 F.Supp. 825 (E.D.Va. 1978) is illustrative of "bald" repudiation, albeit pre *Jim McNeff, Inc.* There the employer materially breached all terms of the prehire agreement, *e.g.*, nonpayment of union scale wages or fringe benefits, refusal to use the hiring hall, and oral communication of intent to repudiate. A finding of repudiation of the prehire agreement was made. To the contrary is *NLRB v. Irwin*, 475 F.2d 1265 (3d Cir.1973). In *Irwin* the employer had performed many terms of the agreement except that he failed to seek an election. The Third Circuit found that the employer's failure was an unfair labor practice but not repudiation of the prehire agreement.

 The Funds argue here that because Callaghan Paving did not seek an union election, this Court should find that no repudiation occurred. There is, however, no *per se* rule requiring an employer to seek an election as a condition precedent to repudiation. Seeking an election is a permissive tactic and a protective measure for an employer. *Albuquerque Insulation Contractors, Inc.*, 256 NLRB 15 (1981). Nor is written notice of repudiation necessary to a finding that the prehire agreement has been repudiated. *Id.*

In the instant case, Daniel Callaghan announced to Venard his intention to repudiate when he explained the reason for stopping payment on the checks. Even if those and allegedly subsequent statements are ignored, the dishonor of the checks is undisputed. Other undisputed facts speak loudly, too. In the eight years following the signing of the prehire agreement, Callaghan Paving made no payments to the Funds. Most significantly none of its employees tried to join Local 673 so that no majority status was achieved. During all that time neither the Funds nor Local 673 complained to Callaghan Paving that it was in breach of the agreement or that pension payments and dues were owing.

The Funds argue that even if notice of repudiation was given to Local 673 through Venard, no notice was given to the Funds. The Funds and the Local 673 are separate and distinct entities. *Lewis v. Benedict Coal*, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). However, the fact that the Funds and the Union are separate for legal purposes will not allow the Funds to erect an impermeable barrier out of its legal autonomy. Here Venard acted as an agent for the Funds. He delivered the prehire agreement which included provisions favorable to the Funds. He collected the check from Daniel Callaghan representing an initial payment to the Funds. There is nothing in the record to indicate whether Venard actually gave the checks to the Funds or whether the Funds made an entry on their books in the name of Callaghan Paving prior to dishonor. If the check never was delivered to the Funds, the Funds never "knew" of their shortlived relationship with Callaghan Paving. If the first check found its way into the Funds' books, a deduction surely followed after dishonor. Presumably the trustees of the Funds inquired about the reason for such a deduction. In either case, notice of an intent to repudiate was given, and reenforced when no further payments were made.

Furthermore, the usual practice is that several union members serve as trustees of that union's fund. Although there is no documentation as to whether that practice varied here, if it was followed, the Funds had direct or constructive knowledge of the notice of repudiation from its Local 673 trustees.

A strong public policy underlies the many decisions which hold employers responsible to pension funds regardless of how their obligations arose or the onerous effect of the obligation on employers. *See Lewis v. Benedict Coal, supra,* and its progeny. The policy advocates the maximum protection of a worker's future income. Although these cases were decided before *Jim McNeff, Inc. v. Todd, supra,* courts should not lightly discount the method chosen by employees to secure their financial futures. The policy is valid, but is inapplicable here. No employees of Callaghan Paving chose to be represented by Local 673 or to expressly or impliedly contribute to these Funds. A finding that Daniel Callaghan repudiated the prehire agreement will not upset the plans or security of any employee of the defendants.

■ Summary judgment is an extraordinary remedy, which should be granted prudently, especially where the subjective factors of motive and intent figure centrally. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *See also Conrad v. Delta Airlines, Inc.,* 494 F.2d 914 (7th Cir.1974); *Askew v. Bloemker,* 548 F.2d 673 (7th Cir.1976). However, here there is no genuine dispute as to any material fact. The Court finds that there was bald noncompliance with the prehire agreement and that the agreement was repudiated, after some short period of time. During that time Callaghan Paving incurred some obligation to the Funds. It is unknown, however, when Venard had notice of the dishonor. Callaghan Paving's obligation to the Funds may run more than two days, perhaps for as long as two weeks. It also is unknown how many employees worked for Callaghan Paving during the days in question.

Although Count II of the complaint seeks recovery from Daniel Callaghan through a "piercing of the corporate veil" mechanism, no alter ego issues have been briefed. Whether Daniel Callaghan is personally liable to the Funds will be decided, as necessary, at a later date.

IT IS THEREFORE ORDERED that

(1) Partial summary judgment is granted in favor of the defendants and against the plaintiffs.

(2) A status hearing will be held on February 22, 1984 at 9:15 a.m. At that time, the parties are ordered to report on their efforts to resolve the amount that Callaghan Paving might owe to the Funds.