**Robert FITZSIMMONS et al.,**
**Plaintiffs-Appellees,**

v.

**Robert BEST et al.,**
**Defendants-Appellants.**

**Robert FITZSIMMONS et al.,**
**Plaintiffs-Appellants,**

v.

**JERSEY STATE BANK and Godfrey**
**State Bank, Defendants-Appellees.**

**Nos. 75–1519 and 75–1520.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1975.

Decided Jan. 22, 1976.

James K. Almeter, Alton, Ill., Robert A. Schnur, Milwaukee, Wis., Alfred B. La Barre, Springfield, Ill., for Best, Fitzsimmons.

Thomas F. Bernardi, Springfield, Ill., for Jersey State Bank.

Before STEVENS, Circuit Justice,[*] TONE, Circuit Judge, and HOFFMAN, Senior District Judge.[**]

PER CURIAM.

This case is an appeal from the order of the trial court dated April 16, 1975,[1] granting summary judgment to Defendants Godfrey State Bank and Jersey State Bank. At issue is the possible liability of the defendant banks for prize money which was allegedly "guaranteed" for a bowling tournament which was to have taken place in 1970.

There appears to be no dispute as to the course the tournament was to have taken. The tournament, organized by Greater St. Louis Sports Enterprises, Inc. (Sports Enterprises), was to have had three stages. First, there were to be competitions at local bowling alleys. A certain number of high scorers at these local tournaments were then to advance to sectional competitions held at various locations across the United States. The winners of these sectional tournaments, in turn, were to advance to the finals in St. Louis. Only the local tournaments were actually held. Plaintiffs in this action are the class of local tournament winners who were denied their chance to compete in the sectionals and—for some of them[2]—the finals. In the advertising for the tournament and on the entry forms it stated that there were prizes guaranteed of $135,000, including a guaranteed first prize of $25,000 in each of the two divisions, men's and women's. Nothing was said as to any possibility that the tournament might not be completed.

Apparently the tournament could not have been held without the "sanctions" of the American Bowling Congress (ABC) and the Women's International Bowling Congress (WIBC).[3] In any case, such sanctions were sought by Sports Enterprises. Although the correspondence between the associations and Sports Enterprises does not appear in the record, it is inferable from later correspondence between the Jersey State Bank, the Godfrey State Bank, the Illinois State Bank of East Alton and the American Bowling Congress that the ABC, at least, required as a condition of granting its sanction that some arrangement be made to ensure that the "guaranteed" prize money would in fact be available for the bowlers.[4]

Sports Enterprises appears to have entered into three arrangements with relation to this prize money. First, there was an arrangement with the Illinois

---

[*] Mr. Justice Stevens participated initially as Circuit Judge, and on and after December 19, 1975, as Circuit Justice.

[**] Senior District Judge Julius J. Hoffman of the United States District Court for the Northern District of Illinois is sitting by designation.

1. Summary judgment was originally entered on May 7, 1974. The order became appealable, however, only on April 16, 1975, when the trial court, pursuant to F.R.Civ.P. 54(b), directed the entry of final judgment on that order and expressly determined that there was "no just reason for delay."

2. It is, of course, impossible at this point to know which particular individuals would have competed in the finals in 1970. Whether individual "winners" will ever be determined, perhaps by a continuation of the tournament under the supervision of the court, or whether some other relief against some defendants will be granted remains undetermined. The trial court has entered summary judgment on the question of liability against Sports Enterprises and against the individual defendants, officers and directors of Sports Enterprises. The individual defendants filed a Notice of Appeal from this order, which was entered on February 19, 1975. However, this appeal, No. 75–1519, was dismissed from the bench at oral argument as the trial court's order was not "final" in the sense of disposing the whole case, and the court did not certify it as final under F.R.Civ.P. 54(b).

3. See, e. g., Deposition of Louis Veccio at 8.

4. See Exhibit "E" to the Complaint, containing seven letters, and Exhibits "A" and "B" to the Complaint.

State Bank of East Alton by which Sports Enterprises would place $1.00 from each $10.00 entry fee into an escrow account. It is undisputed that only a single $1.00 deposit was ever made to that account. Arrangements were also made with the Jersey State Bank and the Godfrey State Bank by which funds were, or were to be, borrowed from those banks to cover the prize money. It is the exact nature of these last two arrangements which is involved in this appeal.

In this diversity case,[5] Illinois law controls the substantive issues. However, the standards for deciding whether summary judgment was appropriate are a matter of federal law. *Lighting Fixture & Electrical Supply Co. v. Continental Insurance Company,* 420 F.2d 1211 (5th Cir. 1969). Thus, summary judgment is appropriate only if it appears that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). For the purpose of determining whether any material fact remains disputed, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The question, then, is whether on the facts in the record (as shown in the affidavits, exhibits, depositions and answers to interrogatories) both banks are entitled to judgment[6] as a matter of law. The District Court held that they were, concluding as a matter of "the traditional rules of contract construction" that "[t]he purpose of the arrangements was that the bowlers could look to the credit of the banks rather than that of [Sports] Enterprises *for prize money after the contest was completed.*" Memorandum and Order of May 7, 1974, at 3–4. We disagree with the District Court's conclusion that this contract can properly be interpreted on summary judgment, without a trial.

The interpretation of an integrated written contract is treated as a matter of law, to be decided by the judge whether or not he is the trier of fact in a particular case. What we have here, however, is a contract the meaning of which must be drawn from various letters, reports of conversations, and actions by the parties, all considered in the light of the circumstances surrounding the parties' actions. The interpretation of a contract, the terms of which are disputed, is very much a matter of the intent of the parties who entered into that contract. Questions of intent are particularly inappropriate for summary judgment. *Conrad v. Delta Air Lines,* 494 F.2d 914, 918 (7 Cir., 1974).

According to the deposition of Mr. A. R. Major, Vice-President of the Jersey State Bank, Sports Enterprises negotiated a loan of $60,000 from them on October 27, 1970. In return for the loan, Sports Enterprises gave the Bank a $60,000 demand note which was guaranteed by the individual shareholders of the corporation. The proceeds of the loan were deposited in a checking account; no deposits in or withdrawals from that account were to be made without Mr. Major's approval. Mr. Major knew that the purpose of the funds was to provide prize money for the tournament. On the day the loan was made, Mr. Major sent a letter to the American Bowling Congress verifying that the $60,000 was on deposit to cover the payment of the prize money, and stating "[i]t is our understanding

---

**5.** The representative plaintiffs are citizens of Pennsylvania; all defendants are citizens of Illinois. Since equitable relief in the form of a trust fund or an order of specific performance is possible, the amount in controversy is the full $135,000 of "guaranteed" prize money. See *Berman v. Narragansett Racing Association,* 414 F.2d 311 (1st Cir. 1969).

**6.** Only defendant Godfrey State Bank moved for summary judgment; however, judgment was granted in favor of both banks. Plaintiffs' motion was denied.

and agreement that this money cannot be released to the winners until a letter of authorization to that effect shall have been received from your organization."[7] However, on December 4, 1970, without obtaining Mr. Major's approval, an unnamed note teller allowed Sports Enterprises to withdraw the funds from the account. The money was then used to pay off the note. On December 9, Mr. Baker, of the ABC, wrote to the Bank to "confirm the understanding and agreement that the moneys you hold with respect to prizes for the Second Annual Handicap Bowling Tournament are not to be released until a letter of authorization has been received from our organization." In response, Mr. Major wrote to the ABC "to advise your office that this money will be available when the tournament finals are held." The letter also stated that the bank had "agreed with Greater St. Louis Sports Enterprises to make arrangements for the money to cover the prizes." According to the deposition, at some time after December 4 Mr. Major also had a telephone conversation with Mr. Baker in which Mr. Major explained that the money had been withdrawn from the account to stop the interest on the note, and that it was to be renegotiated at a later date.

A similar, but not identical, course of events occurred with the Godfrey State Bank. A line of credit in the amount of $75,000, guaranteed by the individual defendants and by certain other individuals, was arranged with Sports Enterprises. The loan guaranty agreement was signed on October 30, 1970; however, Sports Enterprises never requested that any credit actually be extended to it under the agreement.[8] On November 10, 1970, the Executive Vice-President of the Godfrey State Bank wrote to the ABC:

> Greater St. Louis Sports Enterprises, Inc. has made arrangements with the Godfrey State Bank whereby $75,000 will be available and will be disbursed only by the executive officer of the Godfrey State Bank at the National Handicap Bowling Tournament with the finals being on December 20, 1970.

On December 9, 1970, the ABC wrote the Godfrey State Bank

> to confirm the understanding and agreement that the moneys you hold with respect to prizes for the Second Annual National Handicap Bowling Tournament are not to be released until a letter of authorization has been received from our organization.[9]

Although the ABC's letter requested an acknowledgement, the record does not show that one was ever sent.

The local tournaments were held, and the plaintiffs competed, between October 30, 1970, and November 16, 1970.

Plaintiffs have put forward two theories under which the defendant banks could be held liable. The first, applying only to the Jersey State Bank, is that the $60,000 deposited to the checking account was a "special deposit" or "escrow" which was to be released only by the agreement of both the ABC and Sports Enterprises. Thus, according to the plaintiffs, Jersey State Bank violated a fiduciary duty when it released the money so that the note could be paid off.[10]

Plaintiff also contends that each bank was a party to a three-way contract between the bank, Sports Enterprises, and the ABC, which required that the prize

---

7. Exhibit "E" to the Complaint at 5.

8. Answer of Godfrey State Bank.

9. Exhibit "E" to the Complaint at 7.

10. Such a relationship between a bank, its depositor, and a third party is certainly possible under Illinois law. See, e. g., *Woodhouse v. Crandall,* 197 Ill. 104, 64 N.E. 292 (1902), involving a deposit made by a lessee as security for his performance of the covenants of a lease. The bank failed. The Illinois Supreme Court characterized the deposit as a kind of trust for the benefit of the lessor. It is not necessary that the bank fail before it is required to perform the terms of a trust which it has undertaken.

money be guaranteed by the bank; thus, the bank would be liable to the bowlers as intended third party beneficiaries to the contract.

■ The validity of either of these theories in this case turns squarely upon a disputed question of fact: what were the terms of the contracts into which the banks had entered?[11] This question can be subdivided. Did each, or either, of the banks enter into an agreement not to release any funds except with the approval of the ABC? If so, was the agreement made for the benefit of the bowlers who entered the tournament, including the plaintiffs here? If so, did the bank's obligation not to release the money except with the approval of the ABC arise immediately, or was it contingent upon the occurrence of some later event? If such an obligation was contingent on the occurrence of a later event, what was that event—the sanctioning of the tournament by the ABC, the completion of a sufficient amount of competitive bowling to enable the class of potential winners to be identified, or the completion of the entire tournament, as the District Court apparently assumed? In short, if the parties had reduced their contract to writing, what would that writing say? Because the contents of the contracts are matters of disputed fact, these questions can be answered only after there has been a trial. The judgment of the District Court is therefore reversed and the case is remanded for trial.

Reversed and remanded.

---

11. We do not understand either bank to claim that it was not a party to any contract.