Charles E. EGGER, Plaintiff-Appellant,

v.

Harlan C. PHILLIPS,
Defendant-Appellee.

No. 80–2503.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1981.

Decided Feb. 1, 1982.

Charles E. Egger, pro se.

Bradley L. Williams, Asst. U. S. Atty., Indianapolis, Ind., for defendant-appellee.

Before PELL and CUDAHY, Circuit Judges and DUMBAULD,* Senior District Judge.

CUDAHY, Circuit Judge.

In this damage action, brought directly under the Constitution, plaintiff-appellant Charles Egger appeals pro se[1] from the

---

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

1. Egger was represented by counsel at the lower court stage of these proceedings. Counsel

district court's grant of summary judgment in favor of defendant Harlan Phillips, Egger's former supervisor at the Federal Bureau of Investigation. In his complaint and supporting papers Egger alleged that Phillips' actions as FBI supervisor violated a number of constitutional provisions, including the First, Fifth, Sixth, Ninth and Fourteenth Amendments, and were ultimately responsible for Egger's allegedly unconstitutional discharge from the FBI. On appeal Egger argues that in granting summary judgment, the district court impermissibly evaluated the documentary evidence submitted by the parties and ignored the presence of several disputed issues of material fact. Because we find that the district court incorrectly analyzed Egger's First Amendment claim, and because our examination of the record confirms the existence of disputed issues of material fact relevant to that claim, we reverse the district court's grant of summary judgment.

## I.

Egger's complaint against Phillips, individually,[2] alleges that Phillips undertook a series of activities intended to cause Egger to lose his employment as a Special Agent with the FBI. The complaint further alleges that these actions were taken in retaliation for Egger's exercise of his First Amendment rights, specifically Egger's attempts to disclose the alleged corruption of another FBI agent. In order to evaluate Egger's First Amendment claim, it is necessary briefly to review the events leading up to Egger's discharge from the FBI.

withdrew immediately following argument before the district court on Phillips' motion for summary judgment. The precise reasons for this withdrawal are not clear from the record.

2. Egger also filed a companion action against the FBI and Director William Webster in his official capacity, alleging that the FBI had wrongfully transferred Egger's principal post of duty from Indianapolis to Chicago. The complaint sought damages equal to Egger's accrued wages from the time of his dismissal until the time the action was filed. *Egger v. United States, et al.*, IP 78–509–C (Holder, J.). This action was dismissed by the district court for

Plaintiff Egger joined the FBI as a Special Agent in January, 1971. After attending FBI training school in Washington, D.C., Egger was assigned to duty in Little Rock, Arkansas; shortly thereafter, he was transferred to the Hot Springs, Arkansas office. In September, 1972 Egger was transferred from Hot Springs to Milwaukee, Wisconsin to fill Bureau personnel needs. During January, 1973, Egger submitted a request for a hardship transfer to the Indianapolis Field Office due to the advanced age and illness of his mother and of his wife's parents. This request was granted on February 14, 1973. Egger remained at the Indianapolis Field Office from February, 1973 until his discharge in June, 1978.

In September of 1977, Egger was assigned to conduct an investigation of gambling operations in Indianapolis. Apparently as a result of this investigation, Egger became suspicious of a fellow agent in the Indianapolis office—Dean Naum. Egger alleges that his efforts to bring his suspicions about Agent Naum's activities to the attention of FBI superiors caused defendant Phillips to unconstitutionally retaliate against him during the period February 13, 1978, to June 26, 1978.

Defendant Harlan Phillips assumed the position of Special Agent in charge of the FBI's Indianapolis Field Office on February 13, 1978. Immediately upon Phillips' arrival in Indianapolis, he was presented with a written complaint from a source not identified to the district court, accusing Egger of having used a Bureau car to attend a school basketball game during a time when Egger was supposed to be on duty.[3] Phillips con-

lack of subject matter jurisdiction on July 9, 1979. An appeal is currently pending in this court. *Egger v. United States, et al.*, No. 79–1858 (filed October 17, 1979).

3. Defendant claimed, and the district court apparently believed, that this was the first time Phillips had discussed or heard about Egger's activities. Plaintiff, however, has submitted evidence suggesting that Phillips was aware of Egger's activities prior to Phillips' arrival in Indianapolis. We believe that the affidavits and supporting evidence submitted by plaintiff raise a factual question as to Phillips' prior

ducted an investigation of the complaint but did not take any disciplinary action against Egger. Instead, Phillips forwarded the results of his investigation, together with Egger's written denial of the charges, to the FBI's Office of Professional Responsibility (OPR), which had recently completed an independent investigation of the Indianapolis Field Office.[4]

On February 21, 1978, Egger complained in a memorandum to Phillips that Special Agent Naum was circulating false rumors about Egger in the office, and had instructed other employees not to speak to Egger because of Egger's involvement in the OPR investigation. When Egger delivered this memo to Phillips, Phillips commented that the FBI took a dim view of employee complaints and sometimes transferred all agents involved.

On March 1, 1978, Egger provided Phillips with a memorandum suggesting that local police officers suspected Special Agent Naum of being "on the take" from organized gambling. Phillips investigated these allegations, and forwarded the results of his investigation to FBI Headquarters together with a suggestion that both Egger and Naum be transferred from the Indianapolis Field Office.

On March 8, 1978, Egger received a telephone call at work from his eleven year old daughter, informing him that someone had fired several shots through his living room window. Egger later described his daughter's emotional state on the phone as "hysterical." Egger immediately left the office in a highly agitated state without informing Phillips of the phone call.[5] Later that evening Egger reported the incident to the local police. On March 9, 1978, Phillips telephoned Egger to express his irritation at Egger's handling of the shooting incident.[6] The two exchanged heated words, and Egger eventually terminated the conversation.

On the morning of March 9, 1978, and again on March 10, Egger called the night clerk at the Indianapolis Field Office and asked to be placed on annual leave for the day. When Phillips learned that Egger had attempted to secure annual leave in this manner, without approval of the appropriate supervisor, he demanded that Egger come to the office for a discussion. Phillips also telephoned FBI Headquarters in Washington, D.C., and obtained authorization either to place Egger on administrative leave or to suspend him, as Phillips saw fit. At the meeting, Phillips informed Egger that the severity of the administrative action taken against him would be determined by the degree of Egger's cooperation. Egger indicated that he was tired of being interrogated by the FBI and suggested that the whole matter might be better handled in federal court. At the close of the meeting Phillips indicated that Egger was being suspended, but later changed the designation to administrative leave.

On March 11, 1978, Phillips telephoned several former colleagues of Egger's to inquire about Egger's past performance. and mental stability. At least one of the colleagues concurred in Phillips' suggestion that a psychiatric examination of Egger might be in order. Phillips then sent a priority teletype to Washington describing the shooting incident, Egger's behavior and Phillips' inquiries, and requesting authorization for an immediate fitness for duty ex-

---

acquaintance with Egger, and that this issue is relevant to Egger's First Amendment claim. *See* Part II *infra.*

4. It is not clear from the record what sparked the OPR investigation. However, it appears that allegations of corruption, including Egger's allegations against Agent Naum, were among the subjects discussed. During the course of the investigation, Egger was also questioned about suspected press leaks in the Indianapolis Office.

5. When a fellow agent who was working with Egger at the time suggested that Egger report the incident before leaving for home, Egger reportedly stated "f*** the Bureau, they're at the bottom of this, anyway."

6. Phillips also telephoned the Office of Professional Responsibility in Washington, D.C. to criticize Egger for failing to immediately report the incident to the FBI and for allowing the local police to conduct an independent investigation.

amination, including a psychiatric exam. Such authorization was granted on March 15, 1978.

On March 18 and 19, 1978, Egger and his wife underwent a psychiatric examination. The examination did not disclose any major personality irregularities, and the psychiatrist informed Phillips that he had found nothing which would disqualify Egger from serving as a Special Agent. Phillips advised Egger to return to duty on March 21, 1978.

Over the course of the next few days, Egger submitted several memoranda to Phillips, detailing his suspicions regarding Special Agent Naum. Egger also informed Phillips that he had prepared a 30-page report containing allegations against personnel in the Indianapolis Field Office, which he intended to furnish either to the Director of the FBI or to the Department of Justice. On March 22, 1978, Egger was the subject of a disciplinary write-up based on his conduct following the March 9th shooting incident.[7] On March 23, 1978, Phillips sent a priority teletype to FBI Headquarters describing the controversy surrounding Egger and Naum, and urging that both be transferred from the Indianapolis office as soon as possible.

On April 25, 1978, Egger's attorney met with a Deputy Attorney General in Washington, D.C. and delivered a lengthy memorandum from Egger detailing various allegations against FBI personnel.[8] On May 1, 1978, FBI Headquarters suspended Egger without pay from May 2, 1978, to May 9, 1978, and placed Egger on probation for a 90-day period.[9] On May 1, 1978, Egger received a special ninety-day performance rating of "unsatisfactory." This evaluation was prepared by Egger's immediate supervisor, Dick Harman, who had initially recommended that Egger be given a performance rating of "excellent," the same rating Egger had received in his last evaluation. After discussing the matter with Phillips, Harman changed his recommended rating from "excellent" to "unsatisfactory." [10]

On May 10, 1978, Egger was advised that he was being transferred to the FBI's Chicago Field Office. On May 17, 1978, Egger sent a letter to FBI Headquarters requesting that his transfer be reconsidered due to the ill health of his mother and his wife's parents. On May 14, 15, and 17, reports alluding to Egger's situation appeared in the local media. On May 17, Phillips sent a memorandum to the Assistant Director of the FBI accusing Egger of leaking information to the press, and stating that Egger's departure from the Indianapolis Field Office was "eagerly awaited." [11] On May 19, 1978, Phillips sent a memo to the Director of the FBI recommending that Egger's request for reconsideration of his transfer be denied.

7. Specifically, Egger was reprimanded for (1) failure to promptly report the shooting incident and to properly obtain approval before taking annual leave; (2) loss of an FBI briefcase; (3) failure to properly charge out an FBI walkie-talkie; (4) failure to submit an accident report to the Indiana State Police, and (5) failure to promptly dictate an investigation report.

8. Presumably this was the thirty-page memo that Egger had previously mentioned to Phillips.

9. The alleged grounds for this disciplinary action were Egger's insubordinate attitude, conduct unbecoming to an agent, failure to obtain proper authorization before taking annual leave and failure to properly charge out and maintain control of FBI property.

10. In an affidavit submitted in support of defendant's motion for summary judgment, Harman indicated that he originally rated Egger's performance as "excellent" because he believed FBI regulations prohibited him from considering activities for which personnel action was pending. Harman further stated that he believed at the time that Egger's conduct was the subject of pending personnel action. When Harman spoke with defendant Phillips about the rating, however, Phillips indicated to him that all of Egger's conduct could be taken into consideration, and that Phillips did not believe Egger deserved an overall rating of excellent. See Affidavit of Dick Harman, ¶ 11, Record at 506–07.

11. Egger has consistently denied furnishing any information to the media, and has repeatedly offered to submit to a polygraph test on this issue. The FBI has never conducted such a test.

Articles concerning the Indianapolis FBI office and various organized crime topics appeared in the news media on May 18, 19, 20, 21, 23 and 24. On May 23, 1978, Phillips called Egger into his office and attempted to question him about the alleged press leaks. Since Egger had previously signed a waiver of rights form and since Phillips had indicated that some of the questions might relate to possible criminal offenses, Egger refused to comment outside the presence of his attorney. Phillips then read Egger a section of the FBI Employee Handbook dealing with insubordination, and indicated that if Egger did not cooperate, he could be found insubordinate and dismissed.

On June 1, 1978, Egger was advised that the Bureau had given careful consideration to Egger's request for reconsideration of his transfer, and that the transfer order was still in effect.

On June 5, 1978, the Assistant Director of the FBI advised Phillips, Egger, and Egger's attorney that he would be in Indianapolis to interview Egger the next day, and that Egger's attorney could be present. By a memorandum to the file dated June 6, 1978, Phillips noted that he had provided various documents to the Assistant Director which "contain numerous indications of derelictions and/or allegations of improper conduct on the part of [Special Agent] Egger." By a memorandum dated June 8, 1978, Phillips recommended to the Assistant Director that "Egger be immediately dismissed as a Special Agent of the FBI." Phillips' memorandum stated that during Phillips' tenure as head of the Indianapolis office, he had found Egger to be

insubordinate, arrogant, uncooperative, devious, untruthful, unpredictable, eccentric, unreliable, universally disliked by the majority of the employees in the Indianapolis Office, and certainly not trusted by the personnel in my office.

By letter dated June 21, 1978, Egger advised the Director of the FBI that due to his personal hardship situation, he would

not be able to report to Chicago, as directed. By teletype dated June 22, the Director of the FBI again affirmed the decision that Egger be transferred, and ordered Egger to report to the Chicago Field Office on June 26, 1978. When Egger failed to report to the Chicago Field Office on that date, he was dismissed from the FBI.[12]

## II.

In evaluating appellant's First Amendment claim, the District Court initially stated that "[t]he basis of a claim for relief under ... the First Amendment Freedom of Speech Clause depends upon the deprivation of a liberty or property interest of constitutional magnitude." Dist.Ct. Opinion at 44. This statement, however, incorrectly characterizes the controlling legal precedents. In *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court held that the lack of a contractual or tenure right to continued employment did not preclude a teacher's claim that the nonrenewal of his contract violated the First and Fourteenth Amendments:

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

408 U.S. at 597, 92 S.Ct. at 2697.

Similarly, in *McGill v. Board of Education of Perkins Elementary School*, 602 F.2d 774 (7th Cir. 1979), this court held that a retaliatory transfer was properly the subject of a First Amendment challenge even though the transfer resulted in no loss of pay, seniority, or other job benefits. Speaking for the court, now Chief Judge Cummings stated:

**12.** Egger appealed his dismissal to the Director of the FBI pursuant to Bureau procedure. This

appeal was denied on July 31, 1978.

The test is whether the adverse action taken by the defendants is likely to chill the exercise of constitutionally protected speech. *Pickering v. Board of Education, supra,* 391 U.S. [563] at 574, 88 S.Ct. 1731. [At 1737, 20 L.Ed.2d 811] This chilling effect can be accomplished through an unwanted transfer as well as through outright discharge.

602 F.2d at 780. Thus, even though Egger may have had no liberty or property right to continued hardship assignment in Indianapolis, his transfer and subsequent dismissal, if carried out in retaliation for the exercise of his First Amendment rights, would violate the Constitution.

### III.

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). For purposes of determining whether factual issues exist, a reviewing court must view all evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir. 1976). If the evidence is subject to conflicting interpretations, or if reasonable people might differ as to its significance, summary judgment is not appropriate. *Staren v. American Bank & Trust Co. of Chicago,* 529 F.2d 1257, 1261 (1976).

■ This court has repeatedly emphasized that cases in which the underlying issue is one of motive or intent are particularly inappropriate for summary judgment. *Baldini v. Local Union No. 1095,* 581 F.2d 145, 151 (7th Cir. 1978); *Askew v. Bloemker,* 548 F.2d 673, 674, 679 (7th Cir. 1976). A determination involving a person's state of mind is seldom susceptible to direct proof, but must be inferred from circumstantial evidence. If improper motive can reasonably be inferred from evidence properly before the court, affidavits denying such motivation do not entitle a defendant to summary judgment. *Conrad v. Delta Airlines,* 494 F.2d 914, 918 (7th Cir. 1974).

■ In view of the large amount of documentary evidence submitted by the parties in the instant case, and the severely conflicting interpretations of that evidence advanced by plaintiff and defendant, we do not believe that defendants have succeeded in demonstrating the absence of any material issues of fact relevant to plaintiff's First Amendment claim. To be sure, defendant Phillips stated in his affidavit that his "sole motivation for taking any action as to Mr. Egger was for the benefit of ensuring the effectiveness of the Indianapolis Field Office." Affidavit of Harlan Phillips, submitted in support of Defendant's Motion for Summary Judgment, Record at 413. This assertion, however, represents only one of several permissible inferences which may be drawn from the record before the district court; it is not a material fact about which there is no reasonable dispute. *See Eichman v. Indiana State University Board of Trustees,* 597 F.2d 1104, 1109 (7th Cir. 1979).

■ It is of course true that a public employee may be transferred notwithstanding his involvement in constitutionally protected activity, if an employer can show that the employee was or would have been transferred even if he had not exercised his First Amendment rights. *Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Thus, the Supreme Court has recently held, in the context of a trial on the merits, that

once the employee has shown that his constitutionally protected conduct played a "substantial" role in the employer's decision not to rehire him, the employer is entitled to show "by a preponderance of the evidence that it would have reached the same decision as to [the employee's] re-employment even in the absence of the protected conduct.

*Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979) (citation omitted).

In the instant case, however, the affidavits and supporting evidence submitted by plaintiff Egger are sufficient to raise at least an inference that Egger would not have been transferred but for his First Amendment activity. For example, Egger alleges that the first time he presented Phillips with allegations of misconduct by other Bureau personnel, Phillips informed Egger that the FBI "took a dim view of complaints, and sometimes transferred all involved." Dist. Ct. Opinion at 3. Significantly, this conversation took place well before the shooting incident at Egger's home, which allegedly formed the basis for many of Phillips' disciplinary actions against Egger. The record also indicated that Phillips responded to many of Egger's allegations against Agent Naum by recommending, in a series of priority teletypes, that Egger be transferred from the Indianapolis Office "as soon as possible." See Dist.Ct. Opinion at 26, 29. Similarly, shortly after the Assistant Director of the FBI advised Phillips that he would be in Indianapolis to discuss Egger's allegations of corruption with Egger and Egger's attorney, Phillips sent a memorandum to the Assistant Director recommending that Egger "be immediately dismissed as a Special Agent of the FBI." Dist.Ct. Opinion at 42. In our opinion, these incidents, together with the other evidence submitted by plaintiff, are sufficient to create a genuine issue of fact as to the actual motivation for the attempted transfer of Egger.[13]

In granting defendant's motion for summary judgment, the district court relied heavily on its determinations that Egger "had no reasonable basis for making many of his allegations," and that Egger's activities "substantially contributed to creating havoc in the Indianapolis Field Office." Dist.Ct. Opinion at 48.[14] In making these determinations, however, the district court necessarily evaluated the factual evidence submitted by the parties, and chose to credit defendant's rather than plaintiff's interpretations of several key events. Such judicial weighing of the evidence is impermissible on a motion for summary judgment, particularly where issues of motive are involved. *Staren v. American National Bank & Trust Co. of Chicago*, 529 F.2d 1257, 1261 (7th Cir. 1976).

■ Moreover, although the Supreme Court has recognized a state employer's legitimate interest in maintaining discipline and preserving harmony among co-workers, *see Pickering v. Board of Education*, 391 U.S. 563, 569–70, 88 S.Ct. 1731, 1735, 20 L. Ed.2d 811 (1968), it has also held that the First Amendment protects criticism communicated privately by an employee to his supervisor, as well as the public expression of dissent. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–697, 58 L.Ed.2d 619 (1979). On the basis of the record before the district court, we cannot say that Egger's criticisms were so abrasive or disruptive of office routine as to be denied First Amendment protection as a matter of law. *See Yoggerst v. Stewart*, 623 F.2d 35 (7th Cir. 1980) (employee's on-the-job criticism of her boss entitled for purposes of summary judgment to First Amendment protection); *cf.*

---

**13.** Our conclusion that summary disposition is inappropriate in the instant case is buttressed by the fact that only limited discovery has taken place. In particular, defendant Phillips has not yet been deposed. *See Illinois State Employees Union v. Lewis*, 473 F.2d 561, 565–66 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 and 410 U.S. 943, 93 S.Ct. 1370, 35 L.Ed.2d 609 (1973) (especially in cases where motivation is a critical issue, summary judgment should not be entered before non-moving party "has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion.") Although plaintiff Egger first filed a notice of

Phillips' deposition in April, 1979, this deposition was stayed, by order of court, until February 14, 1980. *See* Dist.Ct. Order of April 12, 1979, Record at 322 (granting defendant's motion to temporarily stay all discovery); Dist.Ct. Order of February 14, 1980, Record at 541 (reversing Magistrate's order vacating notice of Phillips' deposition).

**14.** The District Court also stated that it "t[ook] judicial notice of the fact that the Federal Bureau of Investigation is a paramilitary organization wherein security of information, discipline and teamwork are of primary importance." Dist.Ct. Opinion at 48.

*Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 25–26 (First Amendment protection denied where appellant's use of threats and his impatience with the process of investigation threatened institutional efficiency "by the manner, time and place in which it was delivered.") [15] Although we think that the question before the district court was close, and we recognize that Egger's First Amendment claim may prove to be without merit, we feel that the viability of conflicting inferences requires us, in the end, to reject the trial court's summary disposition of this case.

## IV.

On appeal, defendant also argues that he was entitled to summary judgment on grounds of qualified immunity. In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court ruled that federal officials sued in their personal capacity were not entitled to absolute immunity from damage actions based upon their alleged violations of citizens' constitutional rights. The Court held, however, that such officials were entitled to qualified immunity for actions taken in good faith with a reasonable belief as to the lawfulness of those actions. 438 U.S. at 506–07, 98 S.Ct. at 2910–2911. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Supreme Court also noted in *Economou* that in some instances, damage suits involving constitutional violations could be decided on a properly supported motion for summary judgment based on the defense of immunity. 438 U.S. at 514, 98 S.Ct. at 2914.

In the instant case, however, defendant's assertion of good faith immunity raises precisely the same issue of motive and intent as does plaintiff's First Amendment claim. Phillips is entitled to prevail on an immunity defense only if he acted for reasons other than in retaliation for plaintiff's exercise of his First Amendment rights. Moreover, despite its limited approval of summary judg-

ment in *Economou*, the Supreme Court had previously held that "[t]he fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976).

Although defendant Phillips argues strenuously that his repeated requests for Egger's transfer were based on his belief that Egger had lost his effectiveness as an agent in the Indianapolis office and were "motivated only by a concern for the legitimate needs of the Bureau," Appellee's Brief at 27, this is only one of several permissible conclusions that could be drawn from the record before the district court. We agree here with the conclusion of this court in *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976), rejecting, for summary judgment purposes, a similar qualified immunity argument:

> the question of whether the defendants acted reasonably and in good faith is itself an ultimate question of fact whose resolution depends on the circumstances of the alleged [retaliatory transfer] and the motivations of the defendants adduced at trial. . . . Plaintiffs are entitled to take to the jury the state of mind defense on which defendants herein rely as long as plaintiffs have adduced specific facts from which a reasonable man, viewing all the evidence in the light most favorable to plaintiffs and resolving all testimonial conflicts in the same manner, could infer that the defendants were acting either in bad faith or unreasonably.

548 F.2d at 679. We believe that the evidence submitted by Egger, while not sufficient to establish defendant's bad faith, meets this standard, and we therefore reject defendant's contention that summary judgment is appropriate on qualified immunity grounds.

## V.

In its memorandum opinion, the district court also dismissed Egger's constitutional

15. It is significant that both *Janusaitis* and *Givhan*, cited prominently by defendant in his brief, involved appeals from judgments entered after trial, rather than challenges to a district court's grant of summary judgment.

claims based on the Fifth, Sixth and Ninth Amendments.[16] We agree with the district court that plaintiff has raised no material issues of fact relevant to these claims, and that defendant is entitled to judgment as a matter of law. We therefore affirm the district court's grant of summary judgment as to plaintiff's Fifth, Sixth and Ninth Amendment claims.

For the reasons set forth in this opinion, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[17]

DUMBAULD, Senior District Judge, dissenting.

It seems plain to me that appropriate action taken for the effective administration of the Indianapolis office of the FBI is not forbidden simply because an eccentric agent seeks to clothe his peculiar behavior in the garb of the First Amendment. There is no indication in the record that the Bureau was "covering up" for Agent Naum or failing to give appropriate attention to Agent Egger's complaints against Naum. Egger had fully exercised his freedom of speech without interference. Any unpleasant consequences suffered by him were not the result of such exercise of constitutional rights but of his injudicious actions.

The distinction between speech and speech "brigaded with action" is clearly recognized in First Amendment jurisprudence * and does not require the Bureau to keep in a particular post an agent whose behavior has terminated his usefulness there.

---

16.  Egger alleged that various of Phillips' disciplinary actions against him violated the Due Process Clause of the Fifth Amendment, that Phillips' questioning of Egger outside the presence of Egger's attorney denied Egger his Sixth Amendment right to counsel, and that Phillips' request that Egger and his wife undergo a psy-chiatric examination violated Egger's right to privacy under the Ninth Amendment.

17.  Circuit Rule 18 shall govern.

* *Brandenburg v. Ohio,* 395 U.S. 444, 456, 89 S.Ct. 1827, 1834, 23 L.Ed.2d 430 (1969).