**State of NORTH CAROLINA ex rel. Rachel A. HAYWOOD, Plaintiff,**

v.

**M.R. BARRINGTON, Deputy Sheriff, individually and in his official capacity; Robert George, Deputy Sheriff, individually and in his official capacity; Jeff Jordan, Sheriff of Montgomery County, in his official capacity; Fidelity and Deposit Company of Maryland, Surety; and Montgomery County, Defendants.**

No. 1:02CV74.

United States District Court, M.D. North Carolina.

April 11, 2003.

Romallus O. Murphy, Greensboro, for State of North Carolina, ex rel, Rachel A. Haywood, plaintiff.

Tyrus Vance Dahl, Jr., Rachel E. Daly, Womble Carlyle Sandridge & Rice, Winston–Salem, for M.R. Barrington, Deputy Sheriff, individually and in his official capacity, Robert George, Deputy Sheriff, individually and in his official capacity, Jeff Jordan, Sheriff of Montgomery County, in his official capacity, Fidelity and Deposit Company of Maryland, Surety, Montgomery County, defendants.

## ORDER

DIXON, United States Magistrate Judge.

This matter comes before the court on Defendants' Motion for Summary Judgment [Doc. # 11] and Defendants' Motion to Strike Plaintiff's Response to Defendants' Motion for Summary Judgment [Doc. # 22]. Plaintiff Rachel A. Haywood, who filed this action pursuant to 42 U.S.C. § 1983, alleging violations of her due process rights in connection with the seizure of $4,709.09 in currency, has responded.

The parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). In this posture, the matter is ripe for disposition.

## I. Factual Summary [1]

Prior to December 28, 2000, the Montgomery County Sheriff's Office received numerous complaints from citizens indicating that Haywood was selling crack cocaine from her home located at 339 Northview Road in Mount Gilead, North Carolina. (George Aff. ¶ 2; Jordan Aff. ¶ 2; Barrington Aff. ¶ 4). A trustworthy confidential informant ("CI") with a lengthy history of providing reliable information to law enforcement officials in connection with drug interdiction operations also advised deputy sheriff Barrington that Haywood was selling crack cocaine from her home. (Barrington Aff. ¶ 2). On December 28, 2000, the CI was dispatched by Barrington to attempt to make a "controlled buy" of crack cocaine from Haywood at her home. The CI returned from Haywood's residence with 0.4 grams of crack cocaine and confirmed that he had purchased this cocaine from Haywood. He further relayed that Haywood had additional quantities of crack cocaine located in her home. (Barrington Aff. ¶ 3).

Based upon the results of this controlled buy and other reliable information, Barrington determined that there was probable cause to believe that Haywood was selling controlled substances from her home. (Barrington Aff. ¶ 5). Accordingly, Barrington sought and obtained a search warrant from Magistrate Linda Hacker on December 29, 2000. (Barrington Aff. ¶ 5). After obtaining this search warrant, Barrington and deputy sheriff George returned to Haywood's residence with officers from the Montgomery County Sheriff's Department and the Mount Gilead Police Department to execute the search warrant. (George Aff. ¶ 3; Barrington Aff. ¶ 6). Upon entering Haywood's home, law enforcement officers found Haywood in the process of flushing rocks of crack cocaine down the commode. A search of Haywood's person revealed additional quantities of crack cocaine in her dress pockets. Various other items of drug paraphernalia were found inside Haywood's residence, along with $4709.09 in cash. (George Aff. ¶¶ 3–4). These items were then seized by law enforcement officers. Haywood was given a receipt for each item seized from her residence, including the $4709.09 in cash. (George Aff. ¶ 3).

Due to her age (approximately 62) and poor health, Haywood was not immediately arrested. Haywood was given the opportunity to consider cooperating with the Montgomery County Vice Unit in connection with further drug interdiction efforts. Haywood was advised of her Miranda rights, which she waived, and she voluntarily spoke to officers about her drug sales. (George Aff. ¶ 4). She was "permitted to turn herself in to authorities," and to sign a typewritten copy of her statement, on the following Monday, January 3, 2001. (Barrington Aff. ¶ 7; Jordan Aff. ¶ 5; see George Aff. ¶ 4). The statement, as signed, included typed text as well as corrections and additions in hand-

---

1. In determining the facts, the court will draw in part from the undisputed portions of the statement of facts as set out in Defendants' brief. (See Pl's Br. in Resp., p. 2 (accepting facts and background information as stated in Defendants' brief, except where refuted in Haywood's affidavits, discussion and exhibits)). Where the facts are refuted by Haywood, through her affidavits, exhibits, or other papers, the court will view the evidence in the light most favorable to Haywood, according her the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995).

writing initialed by officer George. The statement read, in part:

> Ms Haywood stated she started out purchasing 1/4 ounce quantites [sic] of crack cocaine every month or so. She decided she did not want to tell officers who she was purchasing it from.
>
> In early part March—or April—2000, Ms Haywood began purchaing [sic] 1/4 ounce quantites [sic] every two weeks for $300. Ms Haywood also chose not to give the name of her source of crack cocaine. Ms Haywood stated she always purchase [sic] the cocaine already "cooked up" and she cuts it into pieces for sell. [sic]
>
> Ms Haywood stated she continued this amount during 2000, Ms Haywood stated she purchased the last ounce either Monday or Tuesday of this week....
>
> Ms Haywood stated she recooks the "cocaine crumbs" back into a larger amount. Ms Haywood then recuts the crack cocaine into individual $20 pieces. Ms Haywood stated she only started selling again due to needing extra money for the bills. Ms Haywood stated she only sells pieces. Ms Haywood stated she kept telling her husband she needs to stop selling before she gets caught. Ms Haywood stated she prayed to GOD to help her quit but each time she need a little bit more money....

(George Aff., Ex. B) (spelling, emphasis, and punctuation as in original).

The investigation, search and seizure in connection with Haywood's drug activities was part of a "joint investigation and administrative forfeiture" between the Montgomery County Sheriff's Office and the United States Customs Service. (Jordan Aff. ¶ 6).[2] Prior to the search and seizure, "as part of an on-going investigation of drug related activity in Montgomery County by the U.S. Customs Service," George contacted Janis Dinschel, an agent with the Customs Service, "about information they had from numerous sources that Rachel Haywood was selling crack cocaine from her house." (Dinschel Aff. ¶ 3). "It was believed that Ms. Haywood was being supplied by a more significant target in the U.S. Customs' investigation." (Dinschel Aff. ¶ 3). After the execution of the search warrant of Haywood's residence, officer George asked Dinschel if he would accept the case as part of a Customs Service investigation into Haywood's supplier. Having worked with officer George and the Montgomery County Sheriff's Office for approximately seven years on federal forfeitures of illegal drug-related assets, Dinschel "routinely" provided officer George with U.S. Customs "Abandonment and Assent to Forfeiture" forms in the event Dinschel was not available when a seizure took place. (Dinschel Aff. ¶¶ 2 & 4).

At some point on or after January 3, 2001, officer George filled out a Customs Service "Abandonment and Assent to Forfeiture" form with regard to the seizure of personal property from the residence of Haywood. The form includes the seal of the United States Customs Service, and includes a caption with the Customs Service office address in Charlotte, North Carolina. The form is typewritten and includes blanks in which handwritten infor-

---

2. In his affidavit, Sheriff Jordan describes the Sheriff's Office policy and procedure for forfeiture of drug-related contraband. Namely, the Sheriff's Office uses as its policy and procedure the U.S. Department of Justice "Guide to Equitable Sharing of Federally Forfeited Property for State and Local Law Enforcement Agencies." (Jordan Aff., Ex. A). Under this policy "anytime a seizure of property is made by the Montgomery County Sheriff's Office which meets the criteria for *federal* forfeiture, a *federal* agency such as the DEA or U.S. Customs is involved with the transaction." (Jordan Aff. ¶¶ 5–6) (emphasis added).

mation may be added. The form states, with handwritten content indicated here with underscore:

On *JANUARY 11, 2001* at approximately *1300* U.S. Customs Special Agents assigned to the Office of the Resident Agent in Charge, Charlotte, North Carolina, seized/retained merchandise as documented on Customs Form 6051, Number *1332060*. This merchandise was seized as evidence of violations of *18 USC 1956 (MONEY LAUNDERING) + 18 USC 981 (DRUG PROCEEDS) + 21 USC 881*.

As the owner of this merchandise, I *RACHEL HAYWOOD* waive any and all right to this merchandise, including the right to file a petition for mitigation, and hereby abandon said merchandise to the U.S. Customs Service for appropriate disposition.

(Pl's Br. in Resp., Ex. 2). Immediately following this text there is a space for "Signature of Owner." In this space there is a handwritten signature "Rachel Haywood," followed by a date "1–3–2001." The "3" in the date was written over a "2". Following the signature line there are two spaces for Haywood's street address, which are filled out in printed handwriting. Finally there are two spaces for the signature and title of two witnesses. Officer George signed his name and title as a single witness. The second witness space was left blank.

Haywood denies having signed this form. As she states in her complaint, "the signature on said document is not plaintiff's signature nor did plaintiff authorize any person to sign her name on her behalf." (Compl.¶18). In support of this allegation, Haywood provides an exhibit which is a report by a forensic document examiner, Durward C. Matheny. (Pl's Br. in Resp., Ex. 7). The report includes an analysis and comparison between nineteen other known signatures of Haywood and the questioned signature. Matheny concluded "it is my opinion that the questioned signature ... shows evidence of an effort to simulate the appearance of Rachel Haywood's signature.... Therefore, I cannot identify the author of the known signatures... as the author of the questioned signature on [the form]." (Pl's Br. in Resp., Ex. 7). Barrington, George and Dinschel each claim that they did not sign or forge Haywood's name on the form, and each believes that the signature on the form is Haywood's signature. (Barrington Aff. ¶ 8, George Aff. ¶ 5, Dinschel Aff. ¶ 4). Haywood does not allege which, if any, particular individual in the Montgomery County Sheriff's Office (such as, for example, officer George) forged her signature. (*See* Pl's Br. in Resp., pp. 3–4).

This court finds that, viewed in the light most favorable to Haywood, the evidence shows that Haywood did not sign the "Abandonment and Assent to Forfeiture" form. The evidence also supports the inference that she did not see the form nor expressly assent to the forfeiture of her currency to the United States in January or February. At the same time, the evidence as presented to this court is not sufficient to permit a reasonable inference that any particular named defendant, such as officer George, forged Haywood's signature on the form. Nevertheless, for purposes of this summary judgment discussion, the court will assume, arguendo, that one of the named Defendants forged Haywood's signature on the form.

■ Upon completing the "Abandonment and Assent to Forfeiture" form, officer George sent the form to Customs agent Dinschel, accompanied by a money order in the amount of $4,709.09. Sometime before February 14, 2001, George also sent Dinschel a description of the Montgomery County Sheriff's Office In-

vestigation in Haywood's case. Dinschel reviewed the information in these documents and ensured that the money seized was either drug proceeds or money laundering proceeds. Dinschel determined that officer George and the Montgomery County Sheriff's Office had properly seized the $4,709.09 from Haywood pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981. United States Customs Service, through Dinschel, then seized the $4,709.09.[3] The money was then *forfeited* to U.S. Customs on February 14, 2001. (Dinschel Aff. ¶ 4)

George also sent Dinschel a form entitled "Request for Transfer of Property Seized/Forfeited by a Treasury Agency," related to Haywood's case. The form is signed by Jeff Jordan, Sheriff, and dated "2/9/01" following Jordan's signature. The form is also signed by a "J. Kent [undecipherable]—Attorney for Mont. Co. DSS," and dated "2–19–01". (Dinschel Aff., Ex. C). Attached to this form is a description of the investigation, search and seizure of Haywood's property.[4] On August 18, 2001, based on the United States Department of Treasury Equitable Sharing Pro-

gram, Customs transferred $3,712.80 to the Montgomery County Sheriff's Office.

In the meantime, during the month of April 2001, the State of North Carolina continued with criminal proceedings against Haywood. Haywood pled guilty and was convicted on April 10, 2001, in the Montgomery County District Court of two state law misdemeanor charges: 1.) maintaining a place which is resorted to by persons using controlled substances, under N.C. GEN. STAT. § 90–108(a)(7), and 2.) possession of drug paraphernalia, under N.C. GEN. STAT. § 90–113.22. Haywood was sentenced to a twelve month term of supervised probation and fined $100. (Pl's Br. in Resp., Ex. 1).

Following the proceeding in district court on April 10, 2001, Haywood contacted the Sheriff's Office to "inquire about her money." (Haywood Aff. ¶ 7). Officer George informed Haywood that the money had been sent to the Customs Office in Charlotte. Haywood then contacted the Customs Office in Charlotte and was informed that she had signed a paper saying she would not seek to get her funds back. (Haywood Aff. ¶ 8). Haywood requested a

---

**3.** Under these facts as described by Dinschel, technically Customs "adopted" the seizure of the currency by the state officers. (*See* Compl. ¶ 23; U.S. Department of Justice "Guide to Equitable Sharing of Federally Forfeited Property for State and Local Law Enforcement Agencies," p. 3 (Attached to Jordan Aff., as Ex. A)). In cases where a federal agency adopts the seizure of currency by local officials, "by reason of the adoption principle, the cash is *deemed to have been seized by the [federal] government and, thus, subject to federal jurisdiction as of ... the date of seizure.*" *United States v. Alston,* 717 F.Supp. 378, 380 (M.D.N.C.1989) (emphasis added). In Haywood's case therefore, the effective date of the seizure of the currency by United States Customs, by operation of the adoption principle, was December 29, 2000.

**4.** Dinschel avers that he received the "Request for Transfer" form at some undisclosed

date, and *then,* after he received this form, "the money was subsequently forfeited on February 14, 2001." (Dinschel Aff. ¶ 4). Neither party takes notice that the "Request for Transfer" form, included as an exhibit to Dinschel's affidavit, bears a signature dated "2–19–01." If this signature was correctly dated, it is impossible that Dinschel could have reviewed that particular signed form prior to the stated date of the forfeiture. Despite this discrepancy, Haywood states in her own affidavit that Sheriff Jordan sent the form to Dinschel on February 9, 2001. (Haywood Aff. ¶ 15). Given that this fact is not disputed, the court will assume, for purposes of this summary judgment motion that Jordan sent the form (or at least the information contained in the form) to Dinschel on February 9, 2001, thereby allowing Dinschel to review this information prior to the alleged date of the federal forfeiture on February 14, 2001.

copy of the document she was alleged to have signed, and shortly thereafter received a copy of the "Assent to Forfeiture" form. For purposes of this summary judgment motion, the court will assume that this day (on or about April 10, 2001) was the first time Haywood saw this form and thus received notice that her funds had been forfeited by the United States Customs Service.

Upon receiving the form, Haywood contacted her trial attorney, who told her to contact the Sheriff with her concerns. (Haywood Aff. ¶ 11). Haywood contacted the Sheriff and "indicated that no one gave her information about her funds until recently." (Haywood Aff. ¶ 12). The Sheriff stated that "she should have started earlier in an attempt to get her money," and that "a lady upstairs saw [her] sign her name on the U.S. Customs form and that her money was gone." (Haywood Aff. ¶ 12). Thereafter, Haywood again contacted the U.S. Customs Office regarding the seized currency, and continued correspondence with Customs up to and including a letter from Norman Setzer, a Seized Property Specialist, on November 19, 2002. In that letter, Setzer indicated "we have [now] discussed this matter on at least 10 occasions. In each case I advised you to seek counsel if in fact you did not sign the document." (Pl's Br. in Resp., Ex. 8).

## II. Procedural History

Haywood filed suit in this court on February 8, 2002, pursuant to 42 U.S.C. § 1983, alleging violations of her due process rights under the United States and North Carolina Constitutions. She named Barrington and George individually and in their official capacity; Jordan in his official capacity; Fidelity and Deposit Company of Maryland as surety on the official bond of the Sheriff; and Montgomery County as defendants. Defendants timely filed their Answer on March 18, 2002, denying the material allegations contained in Haywood's Complaint and asserting numerous affirmative defenses.

Defendants filed their Motion for Summary Judgment [Doc. # 11] on October 18, 2002, arguing that the facts failed to show a due process violation, or, in the alternative, that the facts otherwise failed to show § 1983 liability in Defendants' official or individual capacities, or that qualified immunity applied. On November 18, 2002, Haywood moved for an enlargement of time [Doc. # 17], until December 10, 2002, to serve a response to the Motion for Summary Judgment. This motion was granted by Order [Doc. # 17] of the Clerk. On December 10, 2002, Haywood moved again for an extension of time, without consent, [Doc. # 19] until December 15, 2002 to serve a response. By Order [Doc. # 21] dated December 17, 2002, this court granted Haywood's motion to extend time until December 15, 2002. Haywood filed her Brief in Response to the Motion for Summary Judgment [Doc. # 20] on Monday, December 16, 2002. Defendants moved to strike [Doc. # 22] the Brief in Response on December 27, 2002.

## III. Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995). However, judges are not " required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex*, 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

## IV. Discussion

### A. Motion to Strike

Defendants argue that Haywood's Brief in Response should be stricken because she did not file a brief by the first deadline, December 10, 2002, and did not file a second Motion for Extension of Time. Contrary to Defendants belief, Haywood did, in fact, timely file a second motion for extension of time with the court. (*See* Doc. # 19). There was good cause for the extension of time, given the recent adverse weather conditions, and the court accordingly ordered an extension of time. (*See* Doc. # 21). But, as Haywood admits, "counsel for plaintiff inadvertently failed to post a copy of said Motion to Counsel for the defendant." (Doc. # 23). By its Order, this court granted Haywood until December 15, 2002, to serve a Brief in Response to the Motion for Summary Judgment. Haywood timely filed her Response pursuant to this Order on December 16, 2002 (given that December 15, 2002, was a Sunday). Finding no undue hardship or prejudice to Defendants, and finding that Haywood's Brief was timely filed in accord with the Order of this court, the court therefore denies Defendants' Motion to Strike.

### B. Motion for Summary Judgment

In her Brief, Haywood indicates that she bases her § 1983 claim on a violation of her due process rights secured by the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. (Pl's Br. in Resp., pp. 4–5). Explaining her due process claim, she argues that because she did not sign the U.S. Customs "Abandonment and Assent to Forfeiture" form (or otherwise have prior knowledge of the form or the forfeiture itself), Haywood received no notice or "opportunity for a hearing" before the forfeiture took place. (Pl's Br. in Resp., pp. 3–4). She thus claims that she was deprived of her property without any available "procedural safeguards," in violation of her procedural due process rights. (*Id.*).

Section 1983 provides a cause of action for the violation of constitutional due process rights by persons acting under color of state law. *See* 42 U.S.C. § 1983. No claim lies under § 1983, however, for

due process violations made under color of federal law. *See Askew v. Bloemker*, 548 F.2d 673, 676–77 (7th Cir.1976); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir.1998). For such deprivations, *Bivens* provides the appropriate basis for a constitutional claim. *See Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (applying *Bivens* to claim under Due Process Clause of the Fifth Amendment); *States Marine Lines, Inc. v. Shultz*, 498 F.2d 1146, 1157 (4th Cir.1974) (applying *Bivens* in case involving claim of improper federal forfeiture in violation of Due Process Clause). Thus, as a preliminary matter, this court must examine whether the deprivation at issue in this case, a federal administrative forfeiture of currency effectuated in partnership with state law enforcement officers, is an action under color of state law, as opposed to an action under color of federal law. To resolve this issue, it is necessary to understand the legal role of state and federal officials in the seizure and forfeiture of Haywood's currency in this case.

■ Seizures of currency accomplished exclusively by state or local agencies may be adopted by the federal government where the conduct giving rise to the seizure is in violation of federal law and the currency is subject to forfeiture under federal law. *United States v. Alston*, 717 F.Supp. 378, 380 (M.D.N.C.1989) *aff'd sub nom, United States v. Winston–Salem/Forsyth County Bd. of Educ.*, 902 F.2d 267, 269 n. 1 & 270–72 (4th Cir.1990); *see* 21 U.S.C. § 881(b); 18 U.S.C. § 981(b)(2)(B) & (C); *see also* U.S. Department of Justice, "A Guide to Equitable Sharing of Federally Forfeited Property for State and Local Law Enforcement

Agencies," March 1994 (attached as Ex. A to Jordan Aff.). After adoption of the seizure, the federal agency may then initiate forfeiture proceedings, which are in rem and civil in nature, against the currency. *Id.* Once a federal agency has adopted a local seizure, a party may not attempt to thwart the forfeiture by collateral attack in the state courts, for at that point exclusive original jurisdiction is vested in the federal court by statute. *Alston*, 717 F.Supp. at 380 (citing 28 U.S.C. § 1355). A party who is aggrieved by the federal proceeding must avail herself of the remedies provided under federal law for return of seized property or judicial review of administrative forfeitures. *See id.;* FED. R. CRIM. P. 41; 21 U.S.C. § 881.

■ In this case, Haywood's currency was apparently first seized by state officials. Nevertheless, federal officials in the U.S. Customs Office, finding probable cause, adopted the seizure sometime thereafter, and then federally forfeited the currency on February 14, 2001. In other words, no state forfeiture of the currency took place, and only a federal forfeiture took place to permanently deprive Haywood of her property. Viewing the evidence in Haywood's favor, U.S. Customs forfeited Haywood's currency, without notice and a hearing, on the basis of a U.S. Customs "Assent to Forfeiture" form that had been forged by officers participating in the U.S. Customs forfeiture of the currency. Haywood's claim, therefore, can only properly be viewed as one against the procedural defects in a *federal* forfeiture brought about by the acts of local police officers acting in a *federal* capacity. Although they were state officers, they were not acting in a capacity as state agents, given that, once the Customs Office seized the currency (deemed to be the date of the original seizure), the forfeiture proceedings were solely a federal action under

federal law. As such, Haywood's claim cannot stand as a § 1983 claim against persons acting under color of *state* law, but rather must be viewed as a *Bivens* claim against persons acting under color of *federal* law. *See Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir.1995) (quoting district court opinion) ("Because [local sheriff's deputy] Cundiff was acting pursuant to federal authority, he took on the rights and obligations of a federal officer."); *Askew*, 548 F.2d at 677 ("[T]he mere assertion that one is a state officer does not necessarily mean that one is acting under color of state law... In the instant case, there can be no doubt that even the actions of this 'dual-status' agent were necessarily taken pursuant solely to federal authority, for he could not have acted under color of state law ...."); *Ostroff v. State of Fla., Dep't of Health & Rehab. Serv.*, 554 F.Supp. 347, 353 (C.D.Fla.1983) ("The defendants... although a state agency and a state official, were not acting under color of state law, but were acting under federal authority." Hence, any Civil Rights claim Ostroff might have against the defendants cannot be brought under § 1983, but must be brought directly under the Due Process Clause of the Fifth Amendment, pursuant to the doctrine of *Bivens* ....); *Ellis v. Blum*, 643 F.2d 68, 83 n. 17 (2d Cir.1981) ("The mere fact that the federal agents happen to be state officials does not, without more, convert every intentional deviation from the federal path into an action under color of state law.").

■ Ultimately, regardless of whether the alleged violation was carried out by a federal or state actor, the constitutional due process analysis remains essentially the same under *Bivens* or § 1983. *See Correctional Services Corp. v. Malesko*, 534 U.S. 61, 82, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (stating that the Supreme Court "has recognized sound jurisprudential reasons for parallelism, as different standards for claims against state and federal actors 'would be incongruous and confusing.'"); *Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir.1995) (stating that *Bivens* effectively created a remedy against federal officers that was "analogous to the § 1983 action against state officials"); *Dachman v. Shalala*, 950 F.Supp. 708, 710 (D.Md.1997) ("[C]ourts generally apply § 1983 law to Bivens cases.") (citing *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). Although the court could dismiss Haywood's case for failure to properly state her claim as a *Bivens* action, the court will instead view Haywood's claim as challenging an action under color of federal law. *See, e.g., Plowman v. U.S. Dept. of Army*, 698 F.Supp. 627, 632 n. 18 (E.D.Va. 1988) (construing claims brought under § 1983 as *Bivens* claims, without dismissal for failure to state a claim). The relevant difference between the two claims for purposes of this case is that the court will look to proper forfeiture procedure and remedies as set out by federal law rather than state law in deciding whether a due process violation has occurred.

In procedural due process claims, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (emphasis in original). Thus, to determine whether a constitutional violation has occurred, it is necessary to ask what process the government provided, and whether it was constitutionally adequate. *See id.* at 126, 110 S.Ct. 975. The court must weigh several factors to determine what procedural protections the Constitution requires in a particular case:

"First, the private interest that will be affected by the official action; second,

the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest...."

*Id.* at 127, 110 S.Ct. 975 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Guided by these factors, the Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the [government] deprives a person of liberty or property." *Id.* (emphasis in original) (citing, *e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (hearing required before termination of employment); *Wolff v. McDonnell,* 418 U.S. 539, 557–558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (hearing required before forfeiture of prisoner's good-time credits); *Fuentes v. Shevin,* 407 U.S. 67, 80–84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (hearing required before issuance of writ allowing repossession of property)).

"In some circumstances, however, the [Supreme] Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* at 128, 110 S.Ct. 975 (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (recognizing that "the necessity of quick action by the State or the impracticality of providing any predeprivation process" may mean that a postdeprivation remedy is constitutionally adequate) (quoting *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981))). Along these lines, two cases, *Parratt v. Taylor* and *Hudson v. Palmer,* "represent a special application of the general *Mathews v. Eldridge* analysis, in which postdeprivation remedies are all the process that is due, simply because they are the only remedies the government could be expected to pro-

vide." *Id.* at 128, 110 S.Ct. 975 (citing *Parratt* and *Hudson,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). In *Parratt,* a state prisoner brought a § 1983 action because prison employees negligently had lost materials he had ordered by mail. The Court ruled that an available tort remedy was all the process the prisoner was due, because any pre-deprivation procedural safeguards that the government did provide, or could have provided, would not address the risk of this kind of deprivation. *Id.* at 129, 110 S.Ct. 975 (discussing *Parratt*). "The very nature of a negligent loss of property made it impossible for the State to predict such deprivations and provide predeprivation process." *Id.* The Court explained:

> The justifications which we have found sufficient to uphold takings of property without any pre-deprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.

*Id.* (quoting *Parratt,* 451 U.S. at 541, 101 S.Ct. 1908).

In *Hudson,* the Supreme Court extended this reasoning to an intentional deprivation of property. A prisoner alleged that, during a search of his prison cell, a guard deliberately and maliciously destroyed some of his property, including legal papers. *Id.* at 129–30, 110 S.Ct. 975 (discussing *Hudson*). In *Hudson,* as in *Parratt,* the state official was not acting pursuant to any established state procedure, but, instead, was apparently pursuing a ran-

dom, unauthorized, personal vendetta against the prisoner. *Id.* at 130, 110 S.Ct. 975 (citing *Hudson,* 468 U.S. at 521 n. 2, 532, 104 S.Ct. 3194). There, the Court reasoned, "[t]he state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Hudson,* 468 U.S. at 533, 104 S.Ct. 3194. Furthermore, "of course, the fact that the guard's conduct was intentional meant that he himself could 'foresee' the wrongful deprivation and could prevent it simply by refraining from his misconduct. Nonetheless, ... an individual state employee's ability to foresee the deprivation is 'of no consequence,' because the proper inquiry under *Parratt* is 'whether the *state* is in a position to provide for predeprivation process.'" *Zinermon,* 494 U.S. at 130, 110 S.Ct. 975 (quoting *Hudson,* 468 U.S. at 534, 104 S.Ct. 3194) (emphasis in original).

More recently, in *Zinermon,* the Supreme Court illustrated the limits of the *Parratt/Hudson* doctrine. *Zinermon* involved a § 1983 suit brought by Darrell Burch against physicians, administrators, and staff members at a Florida state mental hospital. 494 U.S. at 114, 110 S.Ct. 975. The state officials admitted Burch into the hospital in accordance with Florida's statutory requirements for voluntary admission to mental health facilities. Burch alleged, however, that the officials deprived him of his liberty, without due process of law, by admitting him to FSH as a "voluntary" mental patient when he was incompetent to give informed consent to his admission.

He claimed that the Florida officials "should have afforded him procedural safeguards required by the Constitution before involuntary commitment of a mentally ill person," 494 U.S. at 115, 110 S.Ct. 975, and that petitioners' failure to do so violated his due process rights.

The officials argued that Burch's complaint failed to state a claim under § 1983 because, in their view, it alleged only a random unauthorized violation of the Florida statutes governing admission of mental patients. The Supreme Court disagreed. Distinguishing *Parratt* and *Hudson,* the Supreme Court held that these allegations stated a claim under § 1983 because Burch's deprivation was (a) foreseeable due to the nature of mental illness and (b) could have been guarded against by the state through a predeprivation procedure to determine competence. 494 U.S. at 133 & 135–37, 110 S.Ct. 975. In distinguishing *Hudson,* the Court emphasized that the mental health officials "disregarded their duty to ensure that the proper procedures were followed, not that they, like the prison guard in *Hudson,* were bent upon effecting the substantive deprivation and would have done so despite any and all pre-deprivation safeguards." 494 U.S. at 137, 110 S.Ct. 975.

██ In this case, postdeprivation process is all that was due, given that the available predeprivation process was bypassed by an intentional, random, unauthorized act by a government official. In contrast to *Zinermon,* the defendants here who forged Haywood's signature[5] "were

5. As noted before, the court assumes only *arguendo* that one or several of the defendants participated in a forgery of Haywood's signature and that Haywood did not sign the form. If, to the contrary, the facts were undisputed that Haywood signed the form, Haywood would clearly have no due process claim. That is, if she had been given the choice to

sign the form, she would have thus had notice of the forfeiture and an opportunity to contest the forfeiture at that time. Her signature on the assent form would, in that case, serve as a waiver of her right to a hearing on the issue. *Wilson v. Swing,* 463 F.Supp. 555, 560 (M.D.N.C.1978). The cases cited by Defendants in support of their claims, finding a

bent upon effecting the substantive deprivation," the forfeiture of the currency, and did so by *deliberately* bypassing the requirement of a valid signature on the federal assent to forfeiture form. The very nature of a forgery requires that the act be deliberate and unauthorized. As such, the forgery in Haywood's case lies in stark contrast to the oversight of a mental patient's competency in *Zinermon*. In this case, beyond requiring a valid signature, and witnesses, the government could not do more to ensure that an individual police officer or group of officers would not randomly and deliberately forge Haywood's signature. Accordingly, only postdeprivation remedies are required, under the *Parratt/Hudson* doctrine.

■ Adequate postdeprivation remedies were, and still are, available to Haywood. A statutory postdeprivation process in cases where a forfeiture is effectuated without notice or hearing is provided by federal law. In particular, 18 U.S.C. § 983(e) provides a procedure by which a person who did not receive notice of a federal forfeiture (thus preventing her from timely initiating a proceeding, under § 983(a)(2)(A), challenging the forfeiture) can file a motion in court to set aside the declaration of forfeiture and institute proceedings to return the funds. Pursuant to § 983(e),

(1) Any person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property, which motion shall be granted if—

(A) the Government knew, or reasonably should have known, of the moving party's interest and failed to take reasonable steps to provide such party with notice; and

(B) the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim.

The movant may file such a motion "not later than *5 years* after the date of the final publication of notice of seizure of the property." § 983(e)(3) (emphasis added).

In this case, assuming that publication of notice of federal seizure of her currency occurred as early as January 2001, Haywood had and still may have until January 2006 to file a motion to set aside the forfeiture on grounds that she did not receive the process due under § 983(a). Accordingly, if she indeed can show that she did not receive notice and opportunity for a hearing on the forfeiture of her currency as a result of Defendants' conduct, the government provides a remedy for such a violation. Given that the government was not in a position to prevent such intentional, unauthorized, forgery prior to the deprivation of her currency, such postdeprivation process is all that is due.

---

waiver of *predeprivation* due process rights to a hearing, would only be helpful in such a factual scenario. (*See* Def's Br. in Supp., pp. 5–6 (citing *e.g.*, *Dusanek v. Hannon*, 677 F.2d 538, 542–43 (7th Cir.1982) (plaintiff failed to take advantage of available and noticed predeprivation procedures), *Wilson*, 463 F.Supp. at 560 (plaintiff signed waiver of hearing form and did *not* challenge validity of her signature))). Given the dispute of fact over whether Haywood signed the form, the court will instead assume arguendo that Haywood did not sign the form and that Haywood did not receive notice of the forfeiture until after it took place. Once this assumption is made, the court must address the issue, not addressed by Defendants in their brief, as to whether postdeprivation process alone is adequate in Haywood's case. Certainly, Haywood may waive her *postdeprivation* process, as Defendants suggest, but such a waiver is material only if that is all the process she is due.

Therefore Haywood's claim that she was deprived due process of law, whether under color of state or federal law, must be rejected.

Haywood relies on *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), and *Fields v. Durham*, 909 F.2d 94 (4th Cir.1990), to support her claim, but these cases are inapposite. In *Logan* the plaintiff was discharged purportedly due to a disability, and he was time-barred from bringing a cause of action due to the failure of the employment commission to convene a proceeding in time. The Supreme Court found that established state procedure did not adequately ensure that a claimant would have an opportunity for a hearing in the event of a failure of the commission to timely convene. Distinguishing *Parratt*, the Court noted that "it is the state system itself that destroys a complainant's property interest [in bringing a claim] whenever the commission fails to convene a timely conference." 455 U.S. at 436, 102 S.Ct. 1148. Thus the established state procedure violated Logan's due process rights to bring a claim. *Id.*

*Logan* is instructively distinguishable from Haywood's case. Here Haywood was not deprived due process pursuant to established statutory procedure. The procedure provided under law, if it had been followed rather than deliberately bypassed by the officers, would have ensured notice and an opportunity for a hearing. Haywood was thus deprived of due process (notice and a hearing) not because of a statutory scheme, but because an officer committed a random and unauthorized intentional act, the forgery of her signature on the assent to forfeiture form. In further contrast to *Logan*, following the intentional act by the officer, statutory procedure did not automatically foreclose the opportunity for a hearing, as was the case

in *Logan*. *See* 455 U.S. at 427, 102 S.Ct. 1148 (state court lost jurisdiction to hear claim, on any basis, after deadline passed). Rather, federal law provides, in 18 U.S.C. § 983(e), an opportunity to have a hearing in the event notice was in fact not given.

*Fields* is also unhelpful to Haywood's case. In *Fields*, the plaintiff was fired from his position as a Maryland state community college dean. He brought a § 1983 action claiming that his property interest in continuing employment had been denied without due process. He alleged in particular that, although he was provided with some notice and some hearing, "the process with which he was provided failed to conform with that required by the College's rules and regulations and his employment agreements." 909 F.2d at 96. In an initial ruling, the Fourth Circuit held, pursuant to *Parratt* and *Hudson* that due process was satisfied by the meaningful postdeprivation remedies available under Maryland tort and contract law. 856 F.2d 655 (4th Cir.1988). The Supreme Court vacated the decision and remanded for consideration in light of *Zinermon v. Burch*. Following the remand from the Supreme Court, the Fourth Circuit still found that due process had been satisfied, but on different grounds. Departing from its initial ruling, the Fourth Circuit determined that meaningful predeprivation procedures were feasible and thus required, under *Zinermon*. 909 F.2d at 97. Nevertheless, the court found that the predeprivation remedies (notice of the discharge and an opportunity to appeal the decision) actually provided to *Fields* in that case were adequate to satisfy due process. *Id.*

*Fields* does not alter the outcome in Haywood's case. In *Fields*, the state community college was able to provide Fields with adequate predeprivation procedures before his dismissal took place. Although the individual defendants did not use the

exact procedures which Field desired, they nonetheless actually provided Field with adequate notice and an opportunity for hearing prior to the dismissal. In Haywood's case, by contrast, while notice and due process procedures were provided by statute in the case of a federal forfeiture, the individuals involved acted to unilaterally and deliberately bypass those procedures entirely. As such, the state could do no more to ensure that officers provide Haywood with notice and an opportunity for a hearing if they were bent on depriving her of such safeguards. The *Parratt/Hudson* doctrine therefore applies, and postdeprivation remedies can suffice to provide due process.

In her affidavit, Haywood additionally seems to be attacking the underlying substantive basis for the forfeiture of her currency, apart from the procedure in which the currency was forfeited. (Haywood Aff. ¶¶ 17–19; *see also* Compl. ¶¶ 12–16, 20). She does not present this argument in her Brief, however. (*See* Pl's Br. in Resp., pp. 3–4, 6). Insofar as Haywood claims that her property was seized and/or forfeited without any *substantive* basis in the law for the seizure or forfeiture, a federal statutory rather than constitutional claim is the proper basis for recovery. Pursuant to 18 U.S.C. § 983, Haywood may challenge the forfeiture by filing a claim of interest in the property. Normally, this claim must be filed soon after notice of the forfeiture is received. § 983(a)(2). In the event she did not receive notice of the forfeiture, Haywood may file a motion to set aside the forfeiture for lack of notice. § 983(e). Then, assuming this motion has merit and is successful, the court will set aside the forfeiture. § 983(e)(2)(A). If the government recommences forfeiture proceedings, (*see* § 983(e)(2)(A)), she may then have the opportunity to file a claim challenging the substantive basis of the forfeiture, if she so desires.[6] § 983(a)(2). A federal constitutional lawsuit, under 42 U.S.C. § 1983 or *Bivens* is not the appropriate basis for such a substantive claim, however.

 Haywood also seems to contend that the procedure by which state officers participate in a federal forfeiture deprives her of constitutional rights. (*See* Compl. ¶ 23). Nevertheless, Haywood does not point to any aspect of the procedure used by state officers participating in a federal forfeiture of currency which is, in itself, a violation of due process. Indeed the pro-

---

**6.** Although the court need not make a finding *on the merits* of Haywood's substantive attack on the validity of the forfeiture, the court notes, nonetheless, that this argument is without merit. The evidence in the record surpasses the low threshold for the establishment of probable cause required for a federal seizure and forfeiture of the entire $4,709.09 in currency found in the search of Haywood's residence. *See Boas v. Smith*, 786 F.2d 605, 609 (4th Cir.1986) (outlining probable cause standard). Given Haywood's statements to officers regarding her ongoing purchases of cocaine from a supplier, processing, and sales of the cocaine from her residence, the court finds that there was probable cause to support the seizure and forfeiture. Namely, there was probable cause that the currency found in Haywood's residence was money "furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Title 21, United States Code]," or was "proceeds traceable to such an exchange," or was money "used or intended to be used to facilitate any violation of [Title 21, United States Code]." 21 U.S.C. § 881(6) (emphasis added). The fact that Haywood had recently received large sums of money for the sale of her car, or for the settlement of an insurance claim, (*see* Haywood Aff. ¶¶ 17–19), does not negate probable cause that all of the money present in her residence and seized by officers was intended to be *furnished in exchange* for a controlled substance or intended to be *used to facilitate* a violation of Title 21, given her admissions of ongoing drug activities.

cedure whereby a federal agency adopts the seizure of property effectuated by state officials, administratively forfeits the property pursuant to federal law at the request of state officials, and then returns a substantial portion of the funds back to the state law enforcement for use in the local office, has been explicitly upheld by this court and the Fourth Circuit. *See United States v. Alston*, 717 F.Supp. 378, 380 (M.D.N.C.1989) *aff'd sub nom, United States v. Winston–Salem/Forsyth County Bd. Of Educ.*, 902 F.2d 267, 269 n. 1 & 270–72 (4th Cir.1990).

Finally, Haywood claims that the actions of Defendants violated her due process rights under the state constitution. In her brief, she provides no separate argument in favor of this claim, but rather "incorporates the discussion in her federal constitutional claims in support of her state constitutional claims." (Pl's Br. in Resp., p. 7). Because Haywood has failed to show a violation of her due process rights under the federal Constitution, the court likewise finds that her state constitutional claim, based on the same grounds, is meritless. Therefore summary judgment is appropriate as to this claim.

In sum, even with material factual disputes resolved in her favor, Haywood has failed to establish a violation of her procedural due process rights. Accordingly, regardless of whether her claim is construed as a § 1983 claim or a *Bivens* claim, it is lacking the essential element of a violation of the Constitution or federal law. As such, the court need not reach subsidiary questions of whether the Defendants are named in the proper capacity or whether they are entitled to qualified immunity, and Defendants motion for summary judgment will be granted.

### V. Conclusion

Based on the foregoing discussion, Defendants' motion to strike [Doc. # 22] is DENIED, and Defendants' motion for summary judgment [Doc. # 11] is GRANTED.

So ordered.